THE STATE ex rel. HARRY T. HEIMBERGER, Appellant, v. BOARD OF CURATORS OF THE UNIVERSITY OF MISSOURI, a Corporation; D. R. FRANCIS, J. C. PARRISH, C. B. ROLLINS, SAMUEL SPARROW, JOHN H. BRADLEY and G. L. ZWICK, Constituting a Majority of Members.

**In Banc, July 18, 1916.**

1. **CONSTITUTIONAL LAW:** Mandatory Statute: Mandamus: **Burden.** It is incumbent on a board of curators of an institution established by the State who refuse to obey a mandatory statute, to establish beyond reasonable doubt that the statute is not susceptible of any reasonable interpretation consistent with the Constitution, which will leave in it any command to them which is enforcible by mandamus and within the scope of the alternative writ.

2. ————: Interpreted by Words Used. No forced or unnatural construction is to be put upon the language used in the Constitution. The primary rule of interpretation is to seek out the thought expressed by the words used. To ascertain that thought, the first resort in all cases is to the natural signification of the words employed, in the order of grammatical arrangement in which the framers have placed them. If thus regarded, the words embody a definite meaning, which involves no absurdity and no contradiction between different parts of the same writing, then that meaning, apparent on the face of the instrument, is the one alone that was intended to be conveyed.

## VOL. 268, APRIL TERM, 1916.    599

State ex rel. v. Board of Curators of University of Missouri.

3. ——: **Departments of the University.** The language of the Constitution which commands that "the General Assembly shall, whenever the public school fund will permit and the actual necessity of the same shall require, aid and maintain the State University, now established, with its present departments," did not deal with the right or power of the General Assembly to establish other departments, but spent its direct force entirely upon an injunction to aid and maintain, under stated conditions, the departments already established. And that being the case, courts are not permitted, for the purpose of attempting to discover some hidden, some occult intent of the people, to resort to documents other than the Constitution itself.

4. ——: ——: **In Light of Constitution of 1865.** There is no such difference between the language of the Constitution of 1875, which required the General Assembly to "aid and maintain the State University, now established, with its present departments" and the language of the Constitution of 1865 which required the General Assembly to "establish and maintain a State University with departments for instruction in teaching, in agriculture, in natural science," as makes invalid a statute increasing the departments of the University. It cannot be assumed, because the word "establish" used in the Constitution of 1865 was omitted and the word "aid" substituted therefor in the Constitution of 1875, that the framers of the Constitution of 1875 recognized the University as already established with definite departments and meant the General Assembly should maintain it with only those departments. There is no need, either for the courts or the General Assembly, to resort to the Constitution of 1865 for an ascertainment of the words used in the Constitution of 1875, for those words are so plain that they need no construction.

5. ——: **Department in University: Not Aided by Other Schools.** A statute authorizing the School of Mines and Metallurgy to provide for courses of study in mining, mechanical, electrical, chemical and civil engineering and to confer scientific degrees, is not violative of the constitutional provision requiring the General Assembly to "aid and maintain the State University," on the theory that it affords a means by which students will be attracted to said school and away from the University, and would not to that extent be an "aid" to the University. The word "aid" means to assist by an appropriation of money.

6. ——: ——: **No Actual Necessity For.** The statute providing for new courses of study in the School of Mines and Metallurgy is not unconstitutional on the theory that there is no "actual necessity" for their establishment. The con-

600    SUPREME COURT OF MISSOURI,

State ex rel. v. Board of Curators of University of Missouri.

stitutional provision requiring the General Assembly to aid and maintain the State University as "the actual necessity of the same may require" simply commands aid to be given under stated conditions, does not forbid aid, and does not refer to necessary courses of study.

7. ——: ——: **Investment of Government in Curators: Control by Legislature.** The language of the Constitution declaring that "the government of the State University shall be vested in a board of curators" does not deprive the General Assembly of power to legislate concerning the University with respect to the establishment of new departments or new courses of study in established departments. These words do not constitute the board a separate and distinct department of the State Government, over which the General Assembly has no control except in the matter of appropriations for its maintenance.

8. ——: ——: **The Word Government.** The language of the Constitution declaring that "the government of the State University shall be vested in a board of curators" vests nothing in them save the government of the University; and "government" means control, direction, regulation, management, exercise of authority in regulating something, and there was in the use of that word no express or implied restriction upon the power of the Legislature to add new departments or courses of study to the University, nor anything to devest the General Assembly of power to legislate respecting the University.

9. ——: ——: **Legislative Power.** The legislative power, subject to the limitations contained in the Constitution, is vested in the General Assembly, which is vested with all legislative power not expressly or by necessary implication forbidden by that instrument.

10. ——: ——: **In Light of Creative Statute.** There is no necessity to resort to extrinsic matter for an ascertainment of the meaning of the words of the Constitution declaring that "the government of the State University shall be vested in a board of curators," for those words plainly do not devest the General Assembly of all legislative control over the University; but if such extrinsic matter is pertinent the most relevant is the Act of 1839 which gave origin to the University and used the same words, and it would be unreasonable to say that the General Assembly by using those words intended to devest itself, for all time, of power to legislate respecting the University.

## Mandamus.

WRIT GRANTED.

*C. C. Bland, Frank H. Farris, J. J. Crites, Watson & Livingston, Lorts & Bruer* and *Holmes & Holmes* for relator.

(1) The university incorporated under the name of the Board of Curators of the University of Missouri is declared to be a body politic. R. S. 1909, sec. 11097. That is, it is a corporation pertaining to the public; a public, not a private, corporation; a *quasi*-municipal corporation, subject to the discretionary control of the law-making power of the State. Head v. Curators, 47 Mo. 220; Carrick Academy v. Clark, 112 Tenn. 483; State v. Irwin, 84 Pac. (Wyo.) 90; Mayor of Baltimore v. Keeley Inst., 81 Md. 106; Downing v. State Brd. of Agr., 129 Ind. 443; University v. Williams, 9 Gill. (Md.) 365; Smith v. Board of Trustees, 141 N. C. 143; Young v. Regents Kansas U., 87 Kan. 239; Applegate v. Taylor, 224 Mo. 465. (2) The board of curators is not invested with judicial power by either the Constitution or any statute of this State; its functions are administrative and executive and its duties are to obey the will of its principal and master, the State, as expressed by the Legislature, and its action in expressing doubt as to the constitutionality of the Buford Act is an impertinent usurpation of judicial power. State ex rel. v. Johnson, 234 Mo. 338; State ex rel. v. Williams, 232 Mo. 56; Smith v. Indiana, 191 U. S. 138; County Court v. West Virginia, 208 U. S. 192; State v. Cruise, 28 Okla. 217; State v. Burley, 80 S. C. 127. (3) The word "govern" as used in section 5, article 11, of our Constitution, and in Sec. 11097, R. S. 1909, is synonymous with the word manage. And the board of curators being nothing more than an executive and administrative body, is the agent of the State created for the purpose of administering the affairs of the university and its departments in such manner as the State by its

Legislature may direct. New Stand. Dict. 1059; Am. Encyc. Dict., 251; St. Louis v. Howard, 119 Mo. 41. And in construction of a constitutional provision its words are to be taken in their ordinary, usual and natural meaning. State ex rel. v. Riley, 203 Mo. 187. (4) The Legislature has from time to time during the history of the university enacted laws in respect to it, and laws prescribing the powers and duties of the board of curators and its officers. It has also required that specific subjects be taught and designated that degrees should be conferred, and this class of legislation has never been challenged by the board until now. R. S. 1865, ch. 65, secs. 17 to 62; R. S. 1909, secs. 11100 to 11149. The legislative construction of the Constitution is entitled to great weight and ought not to be departed from unless manifestly wrong. Sanders v. St. Louis Anc. Line, 97 Mo. 26; State ex rel. v. Railroad, 74 Mo. 166; State v. Hostetter, 137 Mo. 636; Railroad v. Brick Co., 85 Mo. 307. (5) If under any possible state of facts an act would be constitutional the courts are bound to presume that such facts exist. 6 R. C. L., sec. 112, p. 112; McGuire v. Railroad, 131 La. 340. (6) There is a strong presumption in favor of the constitutionality of a legislative act, and it will not be declared invalid unless its unconstitutionality is so manifest as to leave no room for reasonable doubt. State ex rel. v. Fort, 210 Mo. 526; State ex rel. v. McIntosh, 205 Mo. 602.

*O. M. Barnett* and *Charles E. Yeater* for respondents.

(1) While, ordinarily, the constitutionality of a statute, imposing duties purely ministerial upon a subordinate ministerial officer, whose personal rights are not thereby involved, cannot be raised by him in a mandamus return, that rule is not appli-

cable here, because the curators of the University are not ministerial officers charged simply with ministerial duties, but are officers, subject to the direction of no superior, holding offices created by section 5 of article 11 of the Constitution, which vests in them as guardians of a public trust the government of the University, and imposes in them the broadest powers of discretion and judgment, expressly untrammelled in the exercise of such powers by any authority in the General Assembly to prescribe the same by law. State ex rel. v. State Bd. of Comrs., 36 Utah, 406; Van Horn v. State ex rel., 46 Neb. 62; Norman v. St. Bd. of Mgrs., 93 Ky. 537; Sterling v. Regents, 110 Mich. 369; State ex rel. v. County Collector, 151 Mo. 663; State ex rel. v. Munson, 153 Mo. 61. (2) The Constitution of 1865 provided that the General Assembly "shall also establish and maintain a State University, with departments for instruction in teaching, in agriculture and in natural science" but the Constitution of 1875 took away from the Legislature that power to "establish" "departments" of the University by striking out the word "establish" and by substituting the new word "aid" in lieu thereof, and concurrently, by a new provision vested in the board of curators the unlimited power of the government of the institution, subject to no directory power of the General Assembly, whereby the establishment, by the Buford Act, of courses in or a department of engineering or mechanic arts at the Rolla School, admitted by relator's pleadings to have been done, is in violation of the Constitution. (3) The rational method and the sound educational policy adopted by the Convention of 1875 was to invest in a compact continuous board of curators the unlimited and unfettered government and control of the University, the members of which by actual contact with the

physical plant, and personally advised by the president and deans of the colleges and schools composing the institution, could plan and carry out a wise and continuous policy, in the conduct and development of the institution.     (4)     The Convention of 1875 took away the former power to "establish a state university with departments" expressly invested in the General Assembly in the Constitution of 1865, and substituted the power to "aid" in lieu thereof, and confirmed and ratified the words of the Act of Feb. 24, 1870, reading, "there is hereby established the Agricultural and Mechanical College and the School of Mines and Metallurgy . . . as a distinct department of the University of the     State     of     Missouri," and made it the duty of the General Assembly to "aid and maintain the State University now established with     its     present     departments." Hence the General Assembly has no power to dis-establish, dis-organize, change or alter departments of the University then, in 1875, established, nor to hinder instead of to "aid" any     of     such     departments, but must "aid" each of the then present departments; and the Buford Act, which thus violates the departmental plan of the University, in the Constitution of 1875, by setting up the same courses and degrees in the Mechanic Arts, alleged in the return, and admitted by the motion for judgment to have been provided for and taught in the said Agricultural and Mechanical College before and during the sitting of the Constitutional Convention of 1875 and thereafter, is therefore void and invalid. (5) The courses provided for in the Buford Act were established by law and given in the Agricultural and Mechanical College at Columbia in 1875, and relator's motion so admits, and the departmental plan of the University in the Constitution requires the General Assembly to aid and maintain

the "present departments" as "the actual necessity of the same may require" and such act therefore violates the requirement of the Constitution by imposing on the treasury continuous future appropriations to maintain at useless expense courses not required by actual necessity and which duplicate existing legal courses of a "department" "present" in 1875, whereby the act is invalid.

BLAIR, J.—This is an original proceeding by mandamus, the purpose of which is to compel the curators of the University of Missouri to obey an act duly passed by the General Assembly of the State and signed by the Governor, March 23, 1915. [Laws 1915, p. 391.] That act amends sections 11134 and 11141, Revised Statutes 1909, and, with the amendatory matter indicated by italics, reads as follows:

"Sec. 11134. *Objects of These Colleges.*—The leading objects of said colleges shall be to teach such branches as are related to agriculture and *mechanic arts* and mining, including military tactics, *and without excluding other scientific and classical studies, in order to promote the liberal and practical education of the industrial classes in the several pursuits and professions of life.*

"Sec. 11141. *Right to Confer Degrees.*—The college of agriculture and the school of mines and metallurgy shall have power to confer degrees suitable to their designs and courses of study; *and the school of mines and metallurgy shall provide courses for, and shall confer the bachelor of science and professional degrees in mining engineering, in metallurgy, in mechanical engineering, in electrical engineering, in chemical engineering, in civil engineering, and the degrees of bachelor and master of science in general science.*"

So far as concerns section 11134, the act merely

restored it to the form in which it was first enacted (Laws 1870, sec. 2, p. 15) and which it had retained (Sec. 7278, R. S. 1879; Sec. 8739, R. S. 1889; Sec. 10505, R. S. 1899) until it was amended in 1909. [Sec. 11134, R. S. 1909.]

The unitalicized portion of section 11141, as above set forth, constituted the entire section 11141 in the Revised Statutes of 1909. The words "college of agriculture" used therein were inserted in 1909 in lieu of the words "the college of agriculture and mechanic arts," and these, in turn (Sec. 10505, R. S. 1899), had supplanted the words "the agricultural and mechanical college" as they appeared in the Act of 1870.

The "colleges" referred to in the Act of 1915 are the College of Agriculture, as it is now called, and the School of Mines and Metallurgy.

The Act of 1870 (Laws 1870, sec. 1, p. 15) which was in force at the time of the adoption of the Constitution of 1875, upon the interpretation of one of the sections of which Constitution the defense depends, established "the Agricultural and Mechanical College and a School of Mines and Metallurgy, provided for by the grant of the Congress of the United States as a distinct department of the University of the State of Missouri."

It is unnecessary to set out the pleadings, since no question of consequence is raised in connection with them. It will suffice to say the return admits relator's capacity to sue, the passage of the Act of March 23, 1915, and respondents' refusal to obey or permit obedience to its command. It is the command of the General Assembly contained in the amendment made by the Act of 1915 to section 11141 which relator seeks to have enforced and the enforcement of which respondents resist.

No question is raised as to the regularity of the

passage of the amendatory act, nor is it contended the amendment it makes to the statute is couched in language whose meaning is obscure or equivocal. Respondents simply deny the power of the General Assembly to exert over them any authority of the kind implied by the enactment of the amendment. Their position is that they are independent of the General Assembly and not subject to its direction or control in any manner or degree. The argument whereby they seek to maintain this position is grounded upon section 5 of article 11 of the Constitution of 1875, which section reads as follows:

"The General Assembly shall, whenever the public school fund will permit and the actual necessity of the same may require, aid and maintain the State University, now established, with its present departments. The government of the State University shall be vested in a board of curators to consist of nine members, to be appointed by the Governor, by and with the advice and consent of the Senate."

The question presented is whether this constitutional provision invalidates the Act of March 23, 1915. In order to maintain the affirmative of this it is incumbent upon respondents to convince us beyond a reasonable doubt that the act assailed is not susceptible of any reasonable interpretation consistent with section 5 of article 11, which will leave in it any command to them which is enforcible by mandamus and within the scope of the alternative writ.

I.  In support of their position that the quoted constitutional provision devests the General Assembly of all authority over the University and vests all authority in respondents, the first branch of the argument advanced is based upon a comparison

Comparison with Constitution of 1865.

608    SUPREME COURT OF MISSOURI,

State ex rel. v. Board of Curators of University of Missouri.

of that provision with section 4 of article 9 of the Constitution of 1865. That section provided that ''the General Assembly shall also establish and maintain a State University with departments for instruction in teaching, in agriculture, and in natural science, as soon as the public school fund will permit.'' The insistence is that, in view of the presence of the command in the Constitution of 1865 that the General Assembly should *establish* ''a State University with departments'' and of the omission of this command from the Constitution of 1875, therefore, in the language of respondents' counsel, it is ''plainly apparent and very clear that the express power to establish a university with *departments* in the General Assembly was withdrawn and came to an end on the adoption by the people of the Constitution of 1875. By their vote the people struck out the word 'establish' and inserted in lieu thereof the word 'aid' and ratified and confirmed the departments at that date 'present' or 'existing.' '' This is counsels' statement.

It may be conceded the Constitution of 1875 deprives the General Assembly of the power to disestablish the University or any department thereof in existence when the Constitution was adopted. That matter is not in issue in this case, and in so far as the argument is directed to that question, save in one particular hereafter noticed, it is not relevant to the question before us. The rest of this argument, however, requires us to ascertain the meaning of the first sentence of section 5 of article 11 of the Constitution, and a restatement of a fundamental principle or two is pertinent. In interpreting the language of the Constitution, ''the thing which we are to seek is the thought which it expresses. To ascertain this, the first resort in all

cases is to the natural signification of the words employed, in the order of grammatical arrangement in which the framers of the instrument have placed them. If thus regarded the words embody a definite meaning, which involves no absurdity and no contradiction between different parts of the same writing, then that meaning, apparent on the face of the instrument, is the one which alone we are at liberty to say was intended to be conveyed. . . . That which the words declare is the meaning of the instrument, and neither courts nor legislatures have a right to add to or take away from that meaning." [Cooley's Const. Limitations (7 Ed.), p. 91.] "In interpreting clauses we must presume that words have been *employed in their natural and ordinary meaning.* As MARSHALL, J., says: The framers of the Constitution and the people who adopted it 'must be understood to have employed words in their natural sense, and to have intended what they have said.' This is but saying that no forced or unnatural construction is to be put upon their language; and it seems so obvious a truism that one expects to see it universally accepted without question; but the attempt is made so often by interested subtlety and ingenious refinement to induce the courts to force from these instruments a meaning which their framers never held, that it frequently becomes necessary to re-declare this fundamental maxim. Narrow and technical reasoning is misplaced when it is brought to bear upon an instrument framed by the people themselves, for themselves, and designed as a chart upon which every man, learned and unlearned, may be able to trace the leading principles of government." [Cooley's Const. Limitations (7 Ed.), pp. 92, 93.]

268 Mo.—39

1.  The words composing the first sentence in
section 5 of article 11 of the Con-
**New Departments.** stitution contain in themselves no
hint of an intent to forbid the establishment by the
General Assembly of new departments in, or in con-
nection with, the University. Plainly and simply
they command that the General Assembly *"shall,*
whenever (1) the public school fund will permit, and
(2) the actual necessity of the same may require,
(a) *aid* and (b) *maintain* the State University, now
established, with its present departments." Ob-
viously, this provision does not directly deal, at all,
with the right or power of the General Assembly to
establish other departments. Its direct force is
spent entirely upon an injunction to aid and main-
tain, under stated conditions, the departments al-
ready established. No "subtlety," no "ingenuity
of argument," logically, can wring from the language
used any other meaning. In such case we are not
permitted, for the purpose of attempting to discover
some hidden, some occult intent of the people, to
resort to documents other than the Constitution it-
self. It is only in case the meaning remains in doubt
after the whole instrument is examined that the
court may turn to extrinsic facts for aid in interpre-
tation. When the words used themselves permit of
no doubt as to the meaning, that ends the matter.
There is no room for construction.

There is no impropriety in adding that we see
nothing in the differences between the language em-
ployed in the Constitution of 1865 and that used in
section 5 of article 11, Constitution 1875, which aids
respondents on this branch of the argument. The
one commanded, under stated conditions, the estab-
lishment of a State University and made mandatory
the inclusion of specified departments. The other,
again under named conditions, commands the Gen-

eral Assembly to *aid* and *maintain* the University with its departments as then established. If the General Assembly was under the necessity of pointing to specific constitutional authorization for all its enactments, there might be something in the argument. Since it is under no such necessity, the argument fails.

2. Next, it is urged the establishment in the School of Mines and Metallurgy of the department or courses prescribed by the Act of March 23, 1915, would be and is quivalent to the disestablishment of the College of Agriculture to the extent to which students who might pursue those studies in the last named school might or would be attracted to the School of Mines and Metallurgy.

**Disestablishment of Existing Departments.**

Unless the General Assembly is forbidden by the Constitution to establish new departments in the State University, or, at least, to establish courses of study in one department which overlap those offered in another, it retains that power, since all legislative authority not denied the General Assembly by the Constitution resides in it. Absent a constitutional limitation upon its powers, the General Assembly certainly may legislate as it wills, subject only to the limitations imposed by the Constitution of the United States. The argument is, however, that the limitation upon the power of the General Assembly to establish new departments or courses of study is found in the constitutional command that the General Assembly shall "aid and maintain" the University with its established departments. The position taken is that to establish a department which might attract students who might have attended the established department, to that extent tends to destroy and not to "aid" such department

612    SUPREME COURT OF MISSOURI,

State ex rel. v. Board of Curators of University of Missouri.

and thus violates the constitutional command to "aid and maintain" such department. The implication invoked by counsel is not warranted by the language of the Constitution. It is not a necessary one, is conjectural and argumentative (Cooley's Const. Limitations (7 Ed.), p. 98) and is not of a kind to warrant us in seizing upon it to pare away the legislative powers of the General Assembly. On the other hand, the command to "aid" the University so clearly has reference to aid by the appropriation of money, that argument in support of that interpretation would be a waste of words and space. That such an injunction furnishes a basis for holding the General Assembly's power limited as insisted is not a tenable position. Whether the spirit of the constitutional provision would be violated by appropriations for other schools or departments before proper "aid" had been given the departments specifically in mind in section 5 of article 11, and whether each General Assembly is the sole judge of the existence of the conditions under which aid is enjoined, are matters not involved on this branch of the case. Neither are we concerned with the policy, wisdom, or even the justice of a constitutional provision not in conflict with the Federal Constitution. When the people of the State, subject to the single condition mentioned, write plain words of plain meaning in their Constitution it is none of our business to deal with its policy, wisdom or justice. We are not empowered to substitute our judgment for that of the whole people. This is the established rule of all courts, and counsel do not question it.

Further, to indicate to what the argument being considered leads, to adopt counsels' interpretation would be to preclude the General Assembly from providing in high schools and normal schools courses of

study overlapping freshmen studies in the University in 1875. That any such result was intended by the words being considered is not a reasonable conclusion.

3. Another contention is that there is no "actual necessity" for the establishment of the cour-

Actual Necessity.

ses named in the Act of March 23, 1915, and, as a consequence, their establishment is forbidden by section 5 of article 11 of the Constitution. This conclusion is reached by again treating that section as dealing with new departments and new courses of study instead of appropriations of money and by interpreting the Constitution as a prohibition against any "aid" except such as is required by "actual necessity." The constitutional provision is not susceptible of such interpretation. It *forbids* nothing in the way of aid and maintenance. It simply *commands* that aid *shall be given* under stated conditions. The argument falls with the incorrect interpretation upon which it is based.

II. It is insisted the provision in section 5 of article 11, that "the government of the

Separate Department of Government.

State University shall be vested in a board of curators" deprives the General Assembly of all power to legislate concerning the University with respect to the establishment of new departments or new courses of study in established departments and, in itself, renders invalid the Act of March 23, 1915. Counsel do not mince words. In plain language they state their contention to be that the quoted words constitute the board of curators a separate and distinct department of the State Gevernment, over which the General Assembly has no power and with which it has practically nothing to do except to make such appro-

priations as it deems proper under that part of section 5 which deals with appropriations as above pointed out. Upon this phase of the case the argument depends wholly upon the meaning of the word "government" as it appears in section 5.

1. The effort to find independent support for this position in the words "vested in" and in the fact that like words are used in the clauses relating to the executive, legislative and judicial departments of the State government fails, of course, since there is nothing "vested in" the board of curators save the "government" of the University, and we are thus brought back to the question as to the meaning of that word.

Several other like arguments are found in respondents' brief. These need no answer other than that which may be found in what is said upon the principal argument as to the meaning of the word government.

2. Another somewhat similar contention is that the board of curators and the General Assembly derive their powers from the same document and that by it they are created separate and distinct constitutional bodies; that a direct power conferred upon one necessarily precludes its existence in the other; that the Constitution vests the government of the University in the board of curators, and, therefore, deprives the General Assembly of that power, and, it follows, the Act of 1915 is invalid. This reasoning begs the question. The question is, what does the word "government" mean? If its meaning is such as to confer upon the board of curators the exclusive powers contended for, that ends the matter and the position taken is correct. If such is not its meaning, then the conclusion does not follow the argument but results from an unjustifiable assumption of the very thing the argument is offered to es-

tablish. The argument employs an *assumed* definition of the word government to define the word. This process cannot advance the investigation.

3. Counsel ground their most earnest effort upon the decision in Sterling v. Regents, 110 Mich. 369. It is necessary to examine this ruling. That case was decided under a provision of the Constitution of Michigan which, so far as relevant, is as follows: "The Board of Regents shall have the general supervision of the University and the direction and control of all expenditures from the University interest fund." An associated provision required, in effect, that the interest on certain funds should be "inviolably appropriated and annually applied" to the maintenance of the University. At the time these constitutional provisions were adopted in Michigan this interest was the University's sole source of support. In 1895 the Michigan Legislature passed an act, the purposes of which were to *disestablish* one of the departments at Ann Arbor, the location of the University, and establish a like department at Detroit. This act was attacked as unconstitutional, and the Supreme Court of Michigan held it invalid on the grounds (1) that the history of the times, the constitutional debates and reports of certain investigating committees indicated the framers of the Constitution intended to exclude the Legislature from all power over the university; (2) that for forty-six years the quoted constitutional provision had been so acted upon and construed; (3) that in a previous case (Weinberg v. Regents, 97 Mich. 246, two of five judges dissenting), involving the liability of the board of regents for failing to require bond of building contractors as provided by statute, the same court had held the board of regents a separate constitutional body and declared that board exempt from the statute; (4) that to

uphold the act in question would nullify the specific control over funds given by the Constitution to the board of regents; (5) that the constitutional provision specifically defined the powers of the board of regents and that such specific definition excluded legislative action of the kind attempted in the act mentioned; and (6) that the Constitution defined the powers of the board of regents and defined those of no other constitutional corporation; that general powers are given the board of regents without specific restriction while those of other boards and offices created by the same Constitution are restricted, and that this implies the exclusion of such restrictions upon the powers of the board of regents, in accordance, the court said, with the rule ''that where a general power over one subject is conferred upon one body in one clause of an instrument, without any restricting or qualifying language, and the like power over another subject is conferred upon another body in another clause of the same instrument, with restricting or qualifying language, the restrictions or qualifications of the second clause cannot be read into the first clause. On the contrary, they must be excluded.''

(a)   Resort to the history of the times, constitutional debates and the like is justified only when the language whose meaning is sought remains doubtful after it has been read in the light of the whole instrument of which it is a part. [Cooley's Const. Limitations (7 Ed.), p. 100.] Even when they are relevant under this rule constitutional debates are not the most trustworthy aids, since these in no wise necessarily represent the views of the majority of the convention and less certainly reflect those of the people whose votes adopt the constitution, but who did not hear the debates. In this case we have before us but a fugitive sentence or two uttered in

the constitutional convention, the report of the debate having been practically destroyed by fire in 1911. What is preserved affords no basis for interpretation. Counsel do 'not contend to the contrary. The history of the University points to probable reasons for taking the appointment of the curators out of the hands of the General Assembly, but could be of little or no aid in determining the meaning of "government" as used in section 5 of article 11. That history is to be found chiefly in certain acts of the General Assembly prior to 1875. None of these arguments could be available, however, except under the conditions stated above.

(b) Practical construction is to be resorted to only when language is doubtful, in the sense stated in the preceding paragraph. What practical construction there has been runs somewhat contrary to respondents' contention. The chapter on the State University discloses a number of acts of the General Assembly purporting to affect the University. Two of these were designed to establish departments or chairs in the University. The board of curators rendered obedience to those.

(c) We have no previous decision in this State comparable to the case of Weinberg v. Regents, supra, upon which the Supreme Court of Michigan declared it might have been content to rest its judgment. Nor does that decision advance any reason for the conclusions reached which are not included in the other grounds of decision in Sterling v. Regents.

(d) Our Constitution gives the board of curators no specific control over funds unless such power is given by vesting in the board the "government" of the University. This merely returns us to the question as to the meaning of that word.

(e)  The same thing is true of  the  Michigan court's ground of decision (5) since the definition in our Constitution of the powers of the board of curators is found in the word "government" used in section 5.

(f)  With respect to the last (6) argument advanced in Sterling v. Regents, it is to be observed it is based upon the proposition that the Michigan Constitution invested the board of regents  of  the University of that State with general powers.  The argument, therefore, if applied here, begins by taking as true the only thing in issue in the case before us.  We can assume that was well enough under the facts in Sterling v. Regents, but, obviously, a like assumption here again begs the question we are asked to decide.  Further, the rule quoted from the Michigan decision (6) we do not regard as unqualifiedly applicable in processes of constitutional construction.  It is certainly not available to expand the meaning of words used without appended  restrictions and introduce into their meaning something new.  The absence of express restrictions upon the meaning of the word "government" adds nothing to its meaning which we are justified in seizing and using to cut down the General Assembly's legislative power further than it is diminished, if at all, by the use of the word itself in its natural sense.

Upon the question presented in this case, we do not, for the reasons given, think the decision in Sterling v. Regents, supra, is authority one way or the other.

4.  The legislative power, subject to the limitations contained in the Constitution, is vested in the General Assembly of the State of  Missouri.   The General Assembly retains all legislative power not expressly or by necessary implication forbidden it by the Constitution.  On the theory that certain lan-

guage wholly withdraws from the field of the General Assembly's legislative power the subject-matter of the act of March 23, 1915, we are asked to hold that act unconstitutional and invalid. With respect to our duty in such case it has been said: "The judiciary can only arrest the execution of a statute when it conflicts with the Constitution, It cannot run a race of opinions upon points of right, reason and expediency with the law making power. Any legislative act which does not encroach upon the powers apportioned to the other departments of the government, being *prima-facie* valid, must be enforced, unless restrictions upon the legislative authority can be pointed out in the Constitution and the case shown to come within them." Further, "when the fundamental law has not limited, either in terms or by necessary implication, the general powers conferred upon the Legislature, we cannot declare a limitation under the notion of having discovered something in the *spirit* of the Constitution which is not even mentioned in the instrument." [Cooley's Const. Limitations (7 Ed.), pp. 236 et seq.]

(a) The single question remaining is whether, under the principle stated, the vesting of the "government" of the University in the Board of Curators expressly or by necessary implication limits the General Assembly's legislative power to such an extent as to render void the act of March 23, 1915. Obviously, section 5 of article 11 contains no express limitation upon the legislative power of the General Assembly, in the sense that it includes any direct prohibition directed against that body. There are in the Constitution many express limitations (Art. 4, sec. 43, et seq.) but it is not contended any of these lend support to respondents' position. The real question, therefore, is whether the exclusion of

legislative authority arises by necessary implication from the word "government" as employed in section 5 of article 11. As stated in the beginning, the words of the Constitution must be given their natural signification in the connection in which they are used. The primary meaning of "government" according to the Century Dictionary and Cyclopedia is "guidance; direction; regulation; management; control; as, the government of one's conduct." Its primary meaning, according to Webster's New International Dictionary, is: "Act or fact of governing; exercise of authority in regulating the action of something; control; direction; rule; regulation; specif. the direction of the affairs of state; the ruling and administration of a political body."

We repeat what has already been said, i. e., that it may be conceded the General Assembly cannot disestablish the State University or abolish any department of it which was in existence when the Constitution was adopted in 1875; and that it is the General Assembly's duty, under conditions fixed by the Constitution, to aid and maintain the University and the departments mentioned. These things do not affect the question before us. The act of March 23, 1915, does not, as pointed out above, conflict with such a construction of the Constitution or purport to work disestablishment of anything. In fact, its aim is plainly the contrary, i. e., to *add* to the University a certain department or courses of study, not to subtract therefrom. This is the thing, therefore, counsel contend is forbidden by necessary implication arising out of the word government. The natural signification of the word is as the dictionaries quoted give it. Now "exercise of authority in regulating something," "guidance," "direction," "regulation," "control," all imply the existence of something subject to such guidance and regulation. They

State ex rel. v. ᴸoard of Curators of University of Missouri.

do not contain the idea of creation, origination, or the like, in whole or in part. The vesting of the powers of government in the legislative, executive and judicial departments implies no attempt to vest in either magistracy any power to add to the State itself. What reason can be given for attributing to "government" a different meaning when used with respect to the powers of the board of curators? If the word vests no power to create or originate departments in the board of curators, it is manifest it gives rise to no implication excluding such powers from the field of the General Assembly's authority, and we cannot strike down the act of March 23, 1915, on the theory that the Constitution commits to the board of curators alone the power of building as well as governing a university. The constitutional powers of the board consist of those which "government" includes—no more and no less. Except as to those the General Assembly is free to act while the powers conferred are beyond the General Assembly's reach. Before, however, we hold the General Assembly powerless to enact particular legislation, he who asserts such lack of power carries the burden of making his position clear beyond a reasonable doubt. We do not think that has been done in this case. Certainly no implication excluding the General Assembly's power to legislate upon subjects of one character can necessarily arise from the fact that authority over subjects of a different character is invested in the board of curators.

(b) There is also in the Constitution itself another provision which supports the conclusion stated. Under the head of "Limitations on Legislative Power" it is provided that "all revenue collected and moneys received by the State from any source whatsoever shall go into the treasury, and the General Assembly shall have no power to divert the same, or to

permit money to be drawn from the treasury, except in pursuance of regular appropriations made by law.'' Neither at the time of the adoption of the Constitution in 1875 nor since has the State University had any income, independent of appropriations by the General Assembly, which bore any considerable ratio to the sums necessary for its maintenance. It must have been apparent to the framers of the Constitution that if the people adopted the Constitution, the University's development and growth, so far as money was required therefor, would depend upon appropriations from the State Treasury. That these appropriations would be under the absolute control of the General Assembly, the framers of the Constitution expressly provided. Nor did they include in that instrument any command or recommendation that the Legislature should appropriate anything for departments in addition to those already established in 1875. Having thus necessarily left in the General Assembly the complete control of the funds available and necessary for the development of the University, it is hardly reasonable to give to the language of section 5 of article 11 a meaning which can be given no actual force and effect, so far as concerns the establishment of new departments and courses of study, unless that force and effect are given by the General Assembly through appropriations for those purposes. We assume it was intended the University should grow. It is hardly conceivable that section 5 of article 11 was framed for the futile purpose of attempting to deny to the General Assembly a power which the provision as to appropriations thus indirectly, but most effectually, vests in the General Assembly beyond all question, no matter what construction is placed upon section 5 of article 11. Of course, there is nothing in the suggestion that the proceeds of the collateral inheritance tax becomes in any sense the

property of the University, any more than any other tax paid into the Treasury, until it is appropriated to the University by the General Assembly. Nor do we understand counsel to press the suggestion to any such extent. This fund, therefore, is also under legislative control and is not available as the basis of an answer to what is said in this paragraph. Nor was any such tax levied in 1875. The Constitution itself thus furnishes another reason for a refusal to agree to respondents' construction of section 5 of article 11.

(c) Again, if extrinsic matter could be said to be pertinent, the act establishing the University is perhaps more relevant to the question before us than is anything else.

The first section of the Act of February 11, 1839 (Laws 1838, sec. 1, p. 176), which gave origin to the University reads thus: "A University is hereby instituted in this State, the government whereof shall be vested in a board of curators." This section has never been amended. [Sec. 11096, R. S. 1909.] It was in that identical form when the Constitution of 1875 was framed and adopted. Certainly, if it is in conflict with section 5 of article 11 of the Constitution it is to that extent invalid. In its language it is not so, however. The word "government" is the key to its meaning, just as it is to the meaning of the sentence of the Constitution under discussion. We do not understand respondents to contend that the word "government" as used in the statute referred to has any other or different meaning from that which it has in section 5 of article 11. If the word is employed in the Constitution in the same sense as in the statute, it is, if there could be any excuse for resorting to ex-

*Comparison of Word Government Used in Constitution and Statute Creating University.*

traneous matter in interpreting the constitutional provision, the nearest at hand, the most apposite, the most natural aid available in the circumstances.

What did the word "government" mean used in relation to the subject and standing in the statutes of the State for thirty-seven years before the Constitution of 1875 was adopted? To say the General Assembly by that language intended to devest itself of power to legislate respecting the University would be unreasonable. Such an intent would have met insuperable constitutional obstacles. No General Assembly could, by mere enactment, cut down the legislative power of any of its successors. So to construe the Act of 1839 and later re-enactments of the same thing is to convict the General Assembly of a course so foolish and ridiculous as to render its action absurd. No court would have put such a construction upon the act had its meaning been drawn in question. Such absurdities are never attributed to legislatures unless there is left no rational means of escape. Such being the case and the Constitution having borrowed the very words of the statute upon the subject, it is not far fetched to offer the statute as corroboration of the conclusion already stated as to the meaning of the word employed in the Constitution.

It is no answer to this to say the statute was and is merely a statute and subject to change by the Legislature. That is true. But that does not justify a construction of the statute which transforms it into a rank absurdity when there is a reasonable, natural and simple interpretation at hand.

As already stated, other arguments are advanced in the briefs, but, as already pointed out, they are logically included within those specifically considered. The alternative writ is made absolute. All concur, except *Bond* and *Faris, JJ.,* not sitting; *Woodson, C. J.,* absent.