CLAIRE A. WARNER, Administratrix of Estate of JOHN M. WARNER, Appellant, v. EDWARD F. GOLTRA, Doing Business Under the Style and Name of the GOLTRA BARGE LINE.—67 S. W. (2d) 47.

Division Two, December 20, 1933.

*Fordyce, Holliday & White* and *Wilson, Kyser, Armstrong & Allen* for appellant.

*Joseph T. Davis* for respondent.

TIPTON, J.—This is an action for damages for the wrongful death of John M. Warner. The appellant's second amended petition states that the appellant, who was the administratrix and widow of John M. Warner, deceased, brought this suit in her own behalf and in behalf of her infant daughter to recover $50,000 damages for the death of her husband against the respondent, Edward F. Goltra, doing business under the style and name of the Goltra Barge Line. Warner was an employee of the respondent and acted as captain or master of the towboat Iowa at the time of his death on May 11, 1926. On that day the Iowa was proceeding in interstate commerce with several barges of freight down the Ohio River. Warner was on board the Iowa in the course of his employment and the scope of his duties and was engaged in interstate commerce but, as he had no license to act as a pilot on this river, the vessel was navigated by a duly licensed pilot. Appellant's petition alleges that due to the negligence of this pilot the barges towed or pushed by the Iowa became grounded. In attempting to unground them, so that the voyage might continue, the pilot so negligently handled and navigated the Iowa that he caused it to collide forcibly with the barges and the bank of the river. As a result of the collision Warner was thrown from the Iowa into the river and was drowned. This action is brought under Section 33 of the Merchant Marine Act of June 5, 1920 (popularly known as the Jones Act), which gives seamen the same rights that railway employees have under the said Employers' Liability Act.

A general demurrer was filed to the appellant's second amended petition, which was sustained by the trial court. Thereafter judgment was entered in favor of the respondent. From this judgment the appellant has appealed to this court.

The appellant in her brief states that the sole issue for this court to decide may be stated as follows: "Did Congress intend to exclude

the masters of vessels and their personal representatives from the remedial effects of Section 33 of the Jones Act?''

In other words the question is, does the word ''seaman,'' as used in the Jones Amendment (June 5, 1920) to the Merchant Seamen, Chapter 18, making the ''Federal Employers' Liability Act'' applicable to seamen as it applies to employees of railroads, include the captain or master of a ship or vessel?

Section 33 of the Jones Act (which is Sec. 688, U. S. C. A., Title 46) is as follows:

''Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; and in case of the death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable. Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located. [Mar. 4, 1915, ch. 153, sec. 20, 38 Stat. 1185; June 5, 1920, ch. 250, sec. 33, 41 Stat. 1007.]''

To determine whether or not the word ''seaman'' includes the word ''master'' it is necessary for us to determine what Congress had in mind when it enacted Section 713 of this chapter. In this section Congress defined certain words that are used in this chapter. It reads as follows:

''In the construction of this chapter, every person having command of any vessel belonging to any citizen of the United States shall be deemed to be the 'master' thereof; and every person (apprentices accepted) who shall be employed or engaged to serve in any capacity on board the same shall be deemed and taken to be a 'seaman;' and the term 'vessel' shall be understood to comprehend every description of vessel navigating on any sea or channel, lake or river, to which the provisions of this chapter may be applicable, and the term 'owner' shall be taken and understood to comprehend all the several persons, if more than one, to whom the vessel shall belong.''

Appellant cites various occupations on board a vessel which the courts have held to be those of a seaman. For instance, an owner of an orchestra was held to be a seaman. [The Sea Lark, 14 Fed. (2d) 201.] An engineer of a dredging barge was held to be a seaman. [City of Los Angeles v. United Dredging Co., 14 Fed. (2d) 365.] So was a watchman in Grimberg v. Admiral Oriental Steamship Line,

300 Fed. 619, and many other cases are cited to show that the word "seaman" has a broader meaning than it had originally. In the days of sailing vessels, the word "seaman" meant one who could "hand, reef and steer," but the courts in attempting to keep up with changed conditions of navigation gave it an enlarged meaning. [Meyer v. Dollar Steamship Line, 43 Fed. (2d) 425.]

The appellant, also, cites cases showing that masters have been held to be seamen under different statutes than that under consideration.

In the case of Burns Bros., 29 Fed. (2d) 855, it was held that a master was a seaman within the meaning of 28 U. S. C. A. 837 (June 12, 1917, ch. 27, sec. 1, 40 Stat. 157; July 1, 1918, ch. 113, sec. 1, 40 Stat. 683), which gave seamen the right to sue in Federal Courts to enforce laws made for their health and safety without prepayment of court costs.

In the case of In re Scott, 250 Fed. 647, the court held that the word "seaman" was broad enough to include "master" in matters of naturalization, and the court in the course of the opinion said: "It is manifest that the word 'seaman' might be used in different enactments in different senses, and the intended sense might appear from the context."

We are also cited to the case of The Balsa, 10 Fed. (2d) 408, in which the court held that the master, injured in the service of the vessel, was entitled to recover, in libel, against her, the cost of his cure and maintenance. However, we do not believe that that case aids us much in construing the statute in question because the action was one not growing out of common-law negligence, nor involving the construction of statutory law, but was one in admiralty.

We have examined the numerous other authorities cited by the appellant, but do not believe that they are sufficiently in point to burden this opinion by making reference to them, as none of them deal with the construction of the statute in question.

It is a general rule that in construing statutes or constitutions, the court may resort to extraneous matters to aid in arriving at a correct interpretation when, and only when, the meaning of the words used is ambiguous or uncertain. [Hamilton v. St. Louis County Court, 15 Mo. 3; State ex rel. v. King, 44 Mo. 283; State ex rel. v. Gammon. 73 Mo. 421; State ex rel. v. Hitchcock, 241 Mo. 433, 146 S. W. 40.]

In the case of State ex rel. v. The University of Missouri, 268 Mo. 598, 188 S. W. 126, we said:

"In such case we are not permitted, for the purpose of attempting to discover some hidden, some occult intent of the people, to resort to documents other than the Constitution itself. It is only in case the meaning remains in doubt after the whole instrument is examined that the court may turn to extrinsic facts for aid in interpretation.

When the words used themselves permit of no doubt as to the meaning, that ends the matter. There is no room for construction."

In Section 713, supra, Congress defines terms as used in this chapter, namely, "master," "seaman," "vessel" and "owner." By this section, the term "master" shall be deemed to be every person having the command of any vessel belonging to any citizen of the United States, and the term "seaman" is deemed to be every person (apprentices excepted) who shall be employed or engaged to serve in any capacity on board the vessel. And then this section defines the terms "vessel" and "owner." This section distinguishes "master" from "seaman" as clearly as it does "vessel" from "owner." "Master" is defined to the exclusion of all others employed or engaged to serve in any capacity on board the vessel. We believe that the term "master" is used as separately and distinctly from the term "seaman" as if the act read: "Every person having the command of any vessel . . . shall be deemed to be the 'master' " and every other "person (apprentices excepted) who shall be employed or engaged to serve in any capacity on board the same shall be deemed and taken to be a 'seaman.' "

We believe that the words used in this section are not ambiguous or uncertain. Congress clearly expressed in the words it used in this section just what it intended and there is no room for construction.

The first part of Section 713, supra, says, "In the construction of this chapter;" then this section defines "master," and "seaman." The reading of this chapter clearly shows that Congress had in mind the distinction between "master" and "seaman," and that the term "seaman" did not include the word "master."

To illustrate, in the following sections of this chapter that the term "seaman" does not include "master" is clearly shown by the context thereof. Section 561 says, "That the master to whom such boy (apprentice) is to be bound is a proper person for the purpose." Section 564 states that the master of every vessel bound from a port in the United States to any foreign port shall before he proceeds on such voyage make an agreement in writing or in printing with every seaman whom he carries to sea as one of the crew, in the manner hereinafter mentioned; and every such agreement shall as nearly as possible be in the form given in the table marked "A," in the schedule annexed to this chapter, and shall be dated at the time of the first signature thereof, and shall be signed by the master before any seaman signs the same. Section 565, among other things, states: "When the crew is first engaged the agreement shall be signed in duplicate, and one part shall be retained by the shipping commissioner, and the other part shall contain a special place or form for the description and signatures of persons engaged subsequently to the first departure

of the ship, and shall be delivered to the master." Section 571 is as follows: "Every master who engages any seamen in any place in which there is a consular officer, otherwise than as required by the preceding section, shall incur a penalty of not more than One Hundred Dollars, for which penalty the vessel shall be held liable." The first part of Schedule "A," referred to in this section, reads as follows: "It is agreed between the master and the seamen or mariners of the ――――, of which ―――――― is at present master, or whoever shall go for master, now bound from the port of ――――――, ――――――, to ――――――, ――――――, 1 . . ."

■ The schedule and sections referred to above clearly show that the term "seaman" does not include the term "master." We, therefore, believe that Congress clearly intended to distinguish "master" from "seaman" and that the word "seaman" does not include the word "master" so as to give the master cause of action under Section 688 of this chapter. Nor do we believe that the fact that the vessel was temporarily in charge of the pilot, at the time of the collision that caused Warner to be thrown into the river, would change the status of the captain or master to that of a seaman. He was still in command of the vessel, except insofar as her navigation was concerned.

In the case of The Oregon, 158 U. S. 186, 39 L. Ed. 943, 15 Sup. Ct. Rep. 804, the United States Supreme Court said:

"Nor are we satisfied with the conduct of the master in leaving the pilot in sole charge of the vessel. While the pilot doubtless supersedes the master for the time being in the command and navigation of the ship, and his orders must be obeyed in all matters connected with her navigation, the master is not wholly absolved from his duties while the pilot is on board, and may advise with him, and even displace him in case he is intoxicated or manifestly incompetent. He is still in command of the vessel, except so far as her navigation is concerned, and bound to see that there is a sufficient watch on deck, and that the men are attentive to their duties. [The Iona, L. R. 1 P. C. 426.]

"In The Batzvier, 1 Spinks Eccl. 378, 383, it was said by Dr. Lushington: 'There are many cases in which I should hold that, notwithstanding the pilot has charge, it is the duty of the master to prevent accident, and not to abandon the vessel entirely to the pilot; but that there are certain duties he has to discharge (notwithstanding there is a pilot on board) for the benefit of the owners.' In an official report made by a maritime commission in 1874, the Elder Brethren of Trinity House are said to have expressed the opinion 'that in well-conducted ships the master does not regard the presence of a duly licensed pilot in compulsory pilot waters as freeing him

from every obligation to attend to the safety of the vessel; but that, while the master sees that his officers and crew duly attend to the pilot's orders, he himself is bound to keep a vigilant eye on the navigation of the vessel, and, when exceptional circumstances exist, not only to urge upon the pilot to use every precaution, but to insist upon such being taken.' [Marsden on Collisions, 255.]''

We do not believe that the master can be considered a seaman within the purview of Sections 688 and 713, supra; the trial court properly sustained the demurrer to appellant's petition. The judgment of the trial court is, therefore, affirmed. All concur.