[No. 2599. June 20, 1921.]

## LAKE ARTHUR DRAINAGE DIST. v. FIELD, State Com'r of Public Lands.

### SYLLABUS BY THE COURT.

1. Specific assessment on property for improvements, based upon benefits, the cost of which is assessed against the property, is not a tax within the constitutional sense.

P. 186

2. Chapter 69, Laws 1917, as amended by chapter 87, Laws 1919, which made the provisions of the drainage act (sections 1877 to 1958, Code 1915) specifically applicable to lands owned by the state of New Mexico, and directed the commissioner of public lands to issue proper vouchers, payable out of the income fund derived from lands of the class benefited, for the payment of the assessment made, is unconstitutional, because under the terms of the Enabling Act, as accepted and confirmed by the Constitution of the state, the state has no power to improve the granted lands and charge the expense of the improvements against said lands, or funds derived from lands belonging to the class benefited.

P. 188

Appeal from District Court, Santa Fe County; Holloman, Judge.

Petition by the Lake Arthur Drainage District for a writ of mandamus against Nelson A. Field, Commissioner of Public Lands, to compel the issuance of vouchers for drainage assessments. Judgment for petitioner on demurrer, and defendant appeals. Reversed, with directions.

H. S. Bowman, Attorney General, and A. M. Edwards, Assistant Attorney General, for appellant.

Reid, Hervey & Iden, of Roswell, for appellee.

## OPINION OF THE COURT.

ROBERTS, C. J.   The Lake Arthur drainage district of Chaves county, on August 20, 1920, filed a petition in the district court of Santa Fe county for a writ of mandamus, directing the commissioner of public lands of New Mexico to issue vouchers for the payment of certain drainage assessments against certain lands granted to the state of New Mexico by the United States, by Act June 21, 1898 (30 Stat. 484), for common school purposes, and confirmed by the Enabling Act, and certain lands for the benefit of the Agricultural College.   Attached to the writ as Exhibit B was the order of the district court confirming the preliminary report of the commissioner, and among the findings made by the court was the following:

"That the proposed work is necessary and of utility in carrying out the purposes of the petition, and the same would promote agricultural interests, and the benefits will exceed the cost in each and every instance upon each and every lot, tract, parcel, or easement of land to be included in said drainage district."

And contained in the final order, which was attached as Exhibit C, were the following findings:

"That the commissioners have caused to be prepared by the said engineer a detailed list of lands to be benefited by the proposed work, and after due and proper consideration, and after a thorough personal examination of each and every 40-acre tract or subdivision within said drainage district, they have assessed against each tract, lot, and easement of land in said district, by whomsoever held, the amount of benefits which they have determined will be caused by the same by the construction of the said drainage system.

"The court further finds that the commissioners have apportioned and assessed the part of the costs of construction above mentioned, over and above the amount assessed against such corporations receiving special benefits as afore-

said, against the several benefited tracts, lots, and easement of land in said drainage district in proportion to the benefits they will derive therefrom.  *  *  *  And the court finds that said assessments as reported by the commissioners for costs of construction, as well as for benefits, are just, fair, and equitable assessments, and have been arrived at after a thorough investigation and examination by the commissioners on the ground.

"That all of the lands within said proposed drainage districts are in need of drainage, and that the drainage thereof as proposed will result in great benefit to and improvement of the said lands; that the system of drainage as proposed by the commissioners, as mentioned and described in their report and as herein referred to, is feasible and proper in all respects and the benefits therefrom on each · and every 40-acre tract or subdivision thereof will be in excess of the assessments made against the said lands."

The application for the writ of mandamus was bottomed on the provisions of chapter 69, Laws 1917, as amended by chapter 87, Laws 1919, which made the provisions of the drainage act (sections 1877 to 1958, except section 1932, Code 1915), specifically applicable to lands owned by the state of New Mexico, and directed the commissioner of public lands to issue proper vouchers, payable out of the income fund derived from lands, of the class benefited, for the payment of assessments made; that is to say, if the lands benefited by the drainage were lands granted to the state of New Mexico for the use of the common schools, then the cost of the improvements must be paid out of the income fund of the common school land.  The commissioner was required under the act to issue his voucher to the state auditor, certifying that the assessment had been legally made and describing the land therein, stating the institutions to which the same pertains, and the auditor was thereupon required to draw his warrant against the income fund of such institution for the amount of such assessment or the installment thereof due.  The excepted section of the Code (1932), which made the drainage assessment a lien on the land, was not made applicable to the granted

lands. As to these lands, no lien was provided for, but payment was to be made as indicated. By section 4, chapter 69, Laws 1917, it is further provided that where state lands were sold under contract upon the deferred payment plan, assessments might thereafter be made against the interest of the purchaser, and any unpaid assessments were made a lien on the equity of such purchaser, and such equity might be sold as other lands. Section 3 provides that any state lands within a drainage district, the value of which has been enhanced by the creation and operation of the system, should not be sold at a price less than their actual value, and provision is made for appraisement. To the alternative writ which was issued the commissioner made return in the form of a demurrer, both to the petition and to the writ.

The demurrer was based on two grounds, briefly stated as follows: (1) That said lands cannot be taxed; (2) that the drainage act, in so far as state lands are concerned, is in contravention of section 10 of the Enabling Act as ratified and accepted by the Constitution of the state (section 9, art. 21). The demurrer was overruled, and the commissioner stood on the demurrer, and judgment was entered against the official, directing him to issue the vouchers for the payment of the assessment alleged to be due in the application for the writ. From the judgment, the present appeal is prosecuted. There are two points involved in the appeal.

[1] We will consider first the question as to whether this is a tax upon state lands in the constitutional sense. Section 3 of article 8 of the Constitution of the state exempts from taxation property of the state. Under this provision it would be beyond the power of the state Legislature to provide for a tax upon state property, but is the levying of assessment in proportion to benefits, in other words an assessment tax, a tax within the constitutional

inhibition? Does section 3 of article 8 of the Constitution relieve the state and the other political subdivisions and institutions therein mentioned from liability for special assessment for direct improvements? This court, in the case of Dexter-Greenfield Drainage District, 21 N. M. 286, 154 Pac. 382, considered at length the drainage act of this state, and to some extent the nature of drainage assessments. We there drew the distinction, generally approved by the authorities, between a tax and an assessment for benefits for improvement. In that case the drainage act was attacked because it conferred upon the court the power of taxation contrary to the Constitution. We there stated:

"The cases referred to in the appellant's brief upon this point are cases involving the collection of taxes, as distinguished from assessments for benefits, as provided in this act. There is a distinction in the authorities between a tax and a special assessment, when involved in the question of the constitutional power to levy and collect the same."

The position was sustained by quotations from Cooley on Taxation and the case of Bryant v. Robbins, 70 Wis. 258, 35 N. W. 545, and many other authorities. It is true there is a conflict of authority upon the proposition, but we believe the better rule is that a specific assessment of property for improvements, the cost of which is assessed against the property, is not a tax within the constitutional sense. The cases are very numerous, and we will cite only the following: City of Clinton v. Henry County, 115 Mo. 557, 22 S. W. 494, 37 Am. St. Rep. 415; Lockwood v. St. Louis, 24 Mo. 20; Sheehan v. Good Samaritan Hospital, 50 Mo. 155, 11 Am. Rep. 412; Edwards Construction Co. v. Jaspar County et al., 117 Iowa 365, 90 N. W. 1006, 94 Am. St. Rep. 301; Commissioners v. Ottawa, 49 Kan. 747, 31 Pac. 788, 33 Am. St. Rep. 396; Mt. Sterling v. Montgomery County, 152 Ky. 637, 153 S. W. 952, 44 L. R. A. (N. S.) 57; New Orleans v. Warner, 175 U. S. 120, 20 Sup. Ct. 44, 44 L. Ed. 96.

In the case of Lockwood v. St. Louis it was held that church property was liable for special sewer assessments; and in the case of Clinton v. Henry County, that the county was liable for special assessments for street paving; and in Sheehan v. Good Samaritan Hospital, that while the charter of the Hospital Company exempted its property from taxation, its real property was held liable for special street improving assessments. It might be that it would be beyond the power of local authorities to make such improvements and assess the cost thereof against the state property without specific statutory authority, but this point is not in this case and need not be determined because here there is specific statutory authority for the assessment and collection of the same. From the foregoing it will be seen that an assessment for benefits is not within the constitutional inhibition.

[2] The main point in this case, however, is whether the restrictions of the Enabling Act as accepted and confirmed by the constitutional convention, and which thereby became part of our fundamental law, impress such a condition upon the land granted to the state for common school purposes, and institutional purposes, that specific assessments cannot be imposed upon such lands. It would require no argument to demonstrate the fact that no lien could be created upon state lands by a specific assessment, or in any other manner, because by section 10 of the Enabling Act it is provided:

"No mortgage or other incumbrance of the said lands, or any thereof, shall be valid in favor of any person or for any purpose or under any circumstances whatsoever."

But the act of the Legislature creates no lien upon the lands, but provides for the payment of the assessment only by vouchers issued by the commissioner of public lands, payable out of a specific fund, to wit, the income fund. It is apparent that the so-

lution of this question depends upon the act of Congress granting the lands, and the acceptance of such provision in our state Constitution, The pertinent provisions of section 10 of the Enabling Act are as follows:

"That it is hereby declared that all lands hereby granted, including those which, having been heretofore granted to said territory, are hereby expressly transferred and confirmed to the said state, shall be by the said state held in trust, to be disposed of in whole or in part only in the manner as herein provided and for the several objects specified in the respective granting and confirmatory provisions, and that the natural products and money proceeds of any of said lands shall be subject to the same trusts as the lands producing the same.

"Disposition of any of said lands, or of any money or thing of value directly or indirectly derived therefrom, for any object other than that for which such particular lands, or the lands from which such money or thing of value shall have been derived, were granted or confirmed, or in any manner contrary to the provisions of this act, shall be deemed a breach of trust. * * *

"A separate fund shall be established for each of the several objects for which the said grants are hereby made or confirmed, and whenever any money shall be in any manner derived from any of said land the same shall be deposited by the state treasurer in the fund corresponding to the grant under which the particular land producing such moneys were by this act conveyed or confirmed. No moneys shall ever be taken from one fund for deposit in any other, or for any object other than that for which the land producing the same was granted or confirmed."

And by section 9, article 21, of the Constitution, the trust was accepted by the state in the following language:

"This state and its people consent to all and singular the provisions of the said act of Congress, approved June twentieth, nineteen hundred and ten, concerning the lands by said act granted or confirmed to this state, the terms and conditions upon which said grants and confirmations were made and the means and manner of enforcing such terms and conditions, all in every respect and particular as in said act provided."

The question then for determination is whether the state Legislature can, under the terms of the granting act, so incorporated in our Constitution, improve the granted property and charge the expense of improvement against the income fund of such land.

Appellee argues that the lands involved in this case were granted to the state originally by section 10 of the Act of June 21, 1898, 30 Stat. at Large, p. 484, which, so far as pertinent to this discussion, is as follows:

"That the lands reserved for university purposes, including all saline lands, and sections 16 and 36 reserved for public schools, may be leased under such laws and regulations as may be hereafter prescribed by the legislative assembly of said territory; * * * and all necessary expenses and costs incurred in the leasing, management, and protection of said lands and leases may be paid out of the proceeds derived from such leases. * * * The remainder of the lands granted by this act, except those lands which may be leased only as above provided, may be sold under such laws and regulations as may be hereafter prescribed by the legislative assembly of said territory; and all such necessary costs and expenses as may be incurred in the management, protection, and sale of said lands may be paid out of the proceeds derived from such sales."

But Enabling Act, § 10, provided:

"That it is hereby declared that all lands hereby granted, including those which, having been heretofore granted to said territory, are hereby expressly transferred and confirmed to the said state, shall be by the said state held in trust, to be disposed of in whole or in part only in the manner as herein provided and for the several objects specified in the respective granting and confirmatory provisions. * * *"

And as this provision was accepted by the constitutional convention, it thereby became a part of our fundamental law to the same extent as if it had been directly incorporated into the Constitution. But even if it be assumed that the original granting act was not affected in any manner by the Enabling Act and the constitutional provision further than

Lake Arthur D. D. v. Field, 27 N. M. 183.

the acceptance of the grant and an agreement in the Constitution to comply with the original granting act, appellee would be in no better position, for it requires no argument to demonstrate that the state would have the power to protect the grant of lands and to charge the expense of such protection to the trust fund. But the charges sought to be imposed upon the trust estate in this case, so far as the record discloses at least, were not incurred for the protection of the land. The drainage law, the act which authorizes the state to pay its proportionate cost of drainage, proceeds upon the theory of benefits or rather improvement of the property and a promotion of agricultural interests.

The decree of the court in this case permitting the assessment finds, not that the assessment was necessary for the protection of the property, but that it was beneficial to the property and that agricultural interests would be promoted thereby. Neither the language of the Enabling Act, nor the granting act of 1898, authorizes the state to improve the granted property. By carefully chosen language the rights and duties of the state are defined and strict limitations are imposed upon the exercise of the power. The money in this case, it is true, was not payable out of the permanent fund, but was to be paid out of the income fund; but this cannot alter the rights of the parties, because the income from the lands was impressed with the same trust as the land itself. That is to say, it could only be used for the support and maintenance of the common schools or the institutions to which it was granted.

The Enabling Act was considered by this court very exhaustively in the case of State v. Llewellyn, 23 N. M. 43, 167 Pac. 414. Of course, what was said there has no direct bearing upon this case. There are no cases in point on the question presented in the instant case. In the case of Edgerton v. Huntington School Township, 126 Ind. 261, 26 N.

E. 156, it was held that congressional township lands in that state were not subject to assessments. In that case the assessments were attempted to be made a lien on the land; the court saying:

"The state has no power to tax such lands, for if it were permitted to do so, it would tax them out of existence, and divert them to the use of the state in the payment of ordinary expenses. So, if they could be assessed for local improvements and exposed to sale at public auction, and sold to the highest bidder, they might be totally absorbed and diverted from the common school fund to a purpose never contemplated when they were reserved. The argument that the lands are benefited to an amount equal to the assessments does not meet the question, for while it is true in theory, and is, perhaps, true in fact, in many cases, that such lands are benefited by public improvements, it does not follow that when exposed to sale for the payment of such assessments, some person will bid enough to cover the enhanced value of the land."

Another case is that of People v. Trustees of Schools, 118 Ill. 52, 7 N. E. 262. The court, speaking of a similar grant of land, said:

"It should not be exposed to the danger of being improved away, by being made to pay for supposed benefits conferred upon it by improvements."

Another case similar to the cases last cited is that of Erickson v. Cass County, 11 N. D. 494, 92 N. W. 841. The court said:

"Neither does the fact that school section No. 16, Wiser township, which lies adjacent to the drain in question, and concededly is benefited by it, was not assessed, furnish any legal ground for complaint. Being school land, it was not assessable, under sections 153, 158, and 163 of the state Constitution. This tract is a portion of the lands granted by the United States to the state in trust for school purposes. The provisions of the grant and its acceptance forbid the imposition of assessments."

The distinguishing feature, of course, between these cases and the one at bar, is that there the assessment was attempted to be made a lien on the land, while here no such lien is authorized, but direct

provision is made for the payment of the assessment out of the income fund, which, under the granting act, could be used only for certain specified purposes; and the improvements of land not being one of the permitted uses of this fund, it would seem to necessarily follow that an act authorizing its use for such purpose would be invalid.

Appellee argues, however, that the drainage of these lands was only incidentally an improvement; that it was absolutely essential for the protection of the land; that without drainage they would become water-logged and so impregnated with alkali that the result would be practically a destruction of the land for any beneficial use. The error in this argument is that there is nothing in the pleadings upon which to base it. The drainage act and the supplemental act providing for the improvement of such lands, payment of the assessment by the commissioner, all the court proceedings in the case leading up to the confirmation of the assessment,, and the petition for the writ of mandamus, show plainly that the proceeding was based upon the theory of improving the lands to be drained, and that agricultural interests would be promoted thereby. If the present act were upheld, it would logically follow that the state could engage in the construction of irrigation enterprises for the improvement of granted lands, and charge the cost of constructing the same against the income fund derived from such lands. Appellee does not argue that this could be done. Many other examples might be suggested, such as fencing land, putting down wells, and other similar examples. The language of the Enabling Act clearly shows that it was not the intention of Congress that the state was to have the power to improve the lands at the expense of the lands or income derived therefrom. We think the present act clearly violates the letter and spirit of the Enabling Act as accepted by the state, and that the court below should have sustained the demurrer.

In this case it is unnecessary to consider the terms of the Enabling Act granting the lands separate and apart from our constitutional provision agreeing on the part of the state to comply with the terms and provisions of the granting act, because it is clear that the Legislature is bound by the constitutional provision independent of the power of Congress to impose restrictions upon the grant which the state is legally bound to observe.

For the reasons stated, the judgment will be reversed, with directions to the trial court to sustain the demurrer; and it is so ordered.

RAYNOLDS and PARKER, JJ., concur.