STATE of Alaska et al., Appellants,

and

Cook Inlet Region, Inc., Appellant
by Intervention,

v.

J. R. LEWIS and Harold H. Galliett, Jr.,
Citizens and Taxpayers of the State of
Alaska, Appellees.

No. 3039.

Supreme Court of Alaska.

Jan. 18, 1977.

James N. Reeves, Asst. Atty. Gen., Anchorage and Avrum M. Gross, Atty. Gen., Juneau, for State of Alaska.

Allen McGrath and John R. Snodgrass, Jr., Anchorage, for Cook Inlet Region, Inc.

Raymond A. Nesbett, Anchorage, for appellees.

OPINION

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, ERWIN and BURKE, JJ.

BOOCHEVER, Chief Justice.

In this appeal we are asked to resolve difficult state constitutional issues involving a three-way exchange of land between the State of Alaska, the United States

Government and the Cook Inlet Region, Inc. (Cook), a regional corporation of Alaska Natives organized under the Alaska Native Claims Settlement Act of 1971. The issue before this court is whether the Alaska statute, Chapter 19, SLA 1976, authorizing the exchange violates state constitutional prohibitions against alienation of mineral rights in state lands and enactment of local and special acts. The state and Cook further raise issues as to the standing of the plaintiffs, and the failure to join the United States of America as an indispensable party.[1] The superior court held that the statute authorizing the land exchange was unconstitutional. The state and Cook have appealed. We reverse the trial court's ruling and find that Chapter 19, SLA 1976 authorizing the land exchange is constitutional.

## FACTS

In 1971, Congress enacted the Alaska Native Claims Settlement Act (ANCSA)[2] with the goal of providing a fair and just settlement of all aboriginal land claims by Native groups in Alaska. Twelve regional Native corporations were established and given the right to select land and share in revenues derived from the sale of minerals. In most of the state, this mechanism worked reasonably well. Within the Cook Inlet Region, however, severe difficulties arose. Existing federal withdrawals, state land selections and other non-Native settlement patterns denied Cook the freedom of selection experienced by other regional corporations. For approximately three years following ANCSA's enactment, Cook negotiated with the Secretary of the Interior over the matter of land selection rights and finally brought the matter before the Federal District Court.[3] While Cook was unsuccessful in District Court, an appeal is now pending. Should Cook prevail on appeal, Cook's action could, in effect, require the United States to challenge the validity of prior state land selections and attempt to recover title to those lands, in order to make land available for selection by Cook.

Pending its appeal in the United States Court of Appeals for the Ninth Circuit, Cook sought legislative relief in Congress. The State, Cook and the Department of the Interior entered into negotiations concerning the exchange of land pursuant to Sec. 22(f) of the ANCSA[4] resulting in an agreement[5] whereby the state was to relinquish lands, including the subsurface minerals therein, to the United States in order to augment the federal holdings from which the Native corporations will obtain their entitlements. For purposes of this transaction, Congress expressly waived the restric-

1. In view of the result reached, we do not pass on the contention that the United States is an indispensable party. For cases where the indispensable party argument was raised but not decided by the court, see *Schraier v. Hickel,* 136 U.S.App.D.C. 81, 419 F.2d 663, 668 n. 13 (1969); *Miller v. Udall,* 113 U.S.App.D.C. 339, 307 F.2d 676, 678 n. 2 (1962); *Safarik v. Udall,* 113 U.S.App.D.C. 68, 304 F.2d 944, 950 (1962). *See also Pan American World Airways, Inc. v. CAB,* 129 U.S.App.D.C. 159, 392 F.2d 483, 486 n. 4 (1968).

2. 43 U.S.C. § 1601 *et seq.* Public Law 92–203, 85 Stat. 688 approved December 18, 1971.

3. *See Cook Inlet Region, Inc. v. Morton,* D.Alaska No. A–40–73 Civil (unreported memorandum decision of February 20, 1975), *appeal docketed, sub nom. Cook Inlet Region, Inc. v. Kleppe* (No. 75–2232, 9th Cir.).

4. Sec. 22(f) of the Alaska Native Claims Settlement Act provides:

The Secretary, the Secretary of Defense, and the Secretary of Agriculture are authorized to exchange any lands or interests therein in Alaska under their jurisdiction for lands or interests therein of the Village Corporations, Regional Corporations, individuals, or the State for the purpose of effecting land consolidations or to facilitate the management or development of the land. Exchanges shall be on the basis of equal value, and either party to the exchange may pay or accept cash in order to equalize the value of the properties exchanged.

5. The agreement entitled "Terms and Conditions for Land Consolidation and Management in the Cook Inlet Area, December 10, 1975" is set out in the House of Representatives Report No. 94–729, 94th Congress, First Session.

tions on alienation of minerals contained in Sec. 6(i) of the Statehood Act, P.L. 94–204, Sec. 17, 94th Congress, First Session. For its relinquishment of certain state lands to the United States, the state would receive approximately two and a half times as many acres of federal lands located elsewhere, plus various other elements of consideration including four public purpose tracts in the Anchorage area, improved selection rights statewide and a greater role in determining where Cook Inlet's land selections may occur. The Act becomes effective only if: (1) Alaska irrevocably committed itself to the land transfer before March 26, 1976, (2) Cook withdraws with prejudice from the Ninth Circuit case and (3) Cook irrevocably withdraws from and waives all of its existing rights in certain lands.

The Alaska Legislature passed Chapter 19, SLA 1976 authorizing the Governor to convey the designated state lands to the federal government in accordance with the agreement. The conveyance was to pass all of the state's rights in the land including the mineral subsurface estate. Section (3) of the Act waives the provisions of AS 38.05.125 restricting the state's right to alienate minerals and AS 38.95.060 authorizing exchanges of land with Native corporations on the basis of equal value.

The plaintiffs below brought suit questioning the validity of legislative or executive consent to the exchange. On June 28, 1976, the trial court enjoined the prospective transfer.

## I. PLAINTIFFS' STANDING TO SUE [6]

In the past, this court has liberally construed the judicial limitation of standing and has favored increased accessibility to the courts.[7] We have not, however, specifically considered whether a taxpayer without a direct financial stake in a particular government expenditure or a citizen who suffers no economic loss has standing to vindicate the public interest.[8] Although in many respects this case is a typical taxpayer or citizen action, we do not now decide whether our liberal interpretation should be extended to permit standing in all such suits. We hold only that under the particular facts involved here,[9] plaintiffs have alleged a sufficient personal stake in the out-

---

**6.** The issue of standing was raised by the defendants in the trial court and on summary judgment motion and is further argued in the briefs. The points of appeal, however, make only general reference to the "denial of summary judgment" with no specific mention of standing. Since the trial court and all counsel knew the issue was contested and it is argued in the briefs, we will review the question. *See Jager v. State,* 537 P.2d 1100, 1103 (Alaska 1975). Our decision to do so, however, should not be read to encourage or condone such departures from the precision required by Appellate Rule 9(e).

**7.** *See Moore v. State,* 553 P.2d 8, 23–25 (Alaska 1976); *Wagstaff v. Superior Court, Family Court Division,* 535 P.2d 1220, 1225–26 (Alaska 1975); *Coghill v. Boucher,* 511 P.2d 1297, 1299 (Alaska 1973); *United States Smelt. Ref. & Mining Co. v. Local Bound. Comm'n,* 489 P.2d 140, 142 (Alaska 1971); *K & L Distributors, Inc. v. Murkowski,* 486 P.2d 351, 353–54 (Alaska 1971); *Alyeska Ski Corporation v. Holdsworth,* 426 P.2d 1006, 1008 (Alaska 1967).

**8.** For a comprehensive background on the development and expansion of the standing doctrine, *see Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), and the many authorities and law review articles cited therein. For cases not adopting this expansive view, *see Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Schlesinger v. Reservist Committee to Stop the War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974).

As stated by Justice Douglas in *Flast v. Cohen,* 392 U.S. at 108, n. 4, 88 S.Ct. at 1957, 20 L.Ed.2d at 966–67 n. 4 (concurring opinion):

> The estimates of commentators as to how many jurisdictions have specifically upheld taxpayers' suits range from 32 to 40. See generally, 3 K. Davis, Administrative Law Treatise § 22.09 (1958), §§ 22.09–22.10 (1965 Supp.); Jaffe, Standing To Secure Judicial Review: Public Actions, 74 Harv.L.R. 1265, 1276–81 (1961); Comment, Taxpayers' Suits: A Survey and Summary, 69 Yale L.J. 895 (1960); *St. Clair v. Yonkers Raceway,* 13 N.Y.2d 72, 77–81, 242 N.Y.S.2d 43, 45–49, 192 N.E.2d 15, 16–19 (1963) (dissenting opinion of Fuld, J.).

**9.** As stated in *Flast v. Cohen,* 392 U.S. 83, 101, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 942, 962 (1968):

> A taxpayer may or may not have the requisite personal stake in the outcome, depending upon the circumstances of the particular case.

come of the controversy to guarantee "the adversity which is fundamental to judicial proceedings".[10]

Looking to the allegations of the complaint, we find several factors which, viewed together, mandate our conclusion. The land transfer allegedly violates two specific constitutional limitations; the restraints on the alienation of mineral resources[11] and the restriction on local and special legislation.[12] Moreover, the complaint underscores the magnitude of the transaction and its potential economic impact on the state. Plaintiffs have claimed that participation in the land transfer will result in losses to the estate treasury and the taxpayers of vast sums of money.

The alleged injury here involves more than economic injury. Like the Supreme Court in *United States v. SCRAP,* 412 U.S. 669, 686, 93 S.Ct. 2405, 2415, 37 L.Ed.2d 254, 269 (1973), and *Sierra Club v. Morton,* 405 U.S. 727, 734, 92 S.Ct. 1361, 1365, 31 L.Ed.2d 636, 643 (1972), we are inclined to recognize that harm to nontraditional and intangible

interests may be sufficient to create an "injury in fact".[13] Here, plaintiffs are seeking to protect mineral resources in land originally selected from the federal government under the Statehood Act. Their interest in the state's retention of mineral rights in state lands is no less significant than the aesthetic and environmental values sought to be vindicated in *Sierra Club* and *SCRAP.*

Finally, although the requisite injury cannot be created by the absence of a more appropriate plaintiff,[14] we note that there is no one in a better position to complain of the constitutional violations alleged here. As we stated in *K & L Distributors, Inc. v. Murkowski,* 486 P.2d 351, 354 (Alaska 1971), in a slightly different context:

[n]o one has a greater interest in the outcome [of the case] than appellants, and if they cannot raise the issue, it is unlikely that the issue will be raised.

While the governor and the attorney general are generally charged with protecting the public interest,[15] their position in this

**10.** In *Moore v. State,* 553 P.2d 8, 23 (Alaska 1976), we explained:
> Whether a party has standing to obtain judicial resolution of a controversy depends on whether the party has a sufficient personal stake in the outcome of the controversy. In our recent decision of *Wagstaff v. Superior Court, Family Division,* 535 P.2d 1220, 1225 (Alaska 1975), we described this requirement in terms of "injury in fact," and explained that its purpose is to assure the adversity which is fundamental to judicial proceedings. (footnotes omitted)

**11.** Alaska Constitution, Art. VIII, Sec. 9; Alaska Statehood Act, Public Law 85–508, Sec. 6(i).

**12.** Alaska Constitution, Art. II, Sec. 19. On appeal, the issue of standing was argued only with respect to the prohibitions of Sec. 6(i) and Art. VIII, Sec. 9. We have considered cases involving Art. II, Sec. 19 in which the issue of standing has not been raised. *Abrams v. State,* 534 P.2d 91 (Alaska 1975); *Boucher v. Engstrom,* 528 P.2d 456 (Alaska 1974).

**13.** *See Wagstaff,* 535 P.2d at 1225 n. 7, where, considering an attorney's right to represent a minor, we quoted Professor Davis who states: "The basic idea that comes out in numerous cases is that an identifiable trifle is enough for standing to fight out a question of principle; the trifle is the basis for standing and the principle supplies the motivation." Da-

vis, Standing: Taxpayers and Others, 35 U.Chi.L.Rev. 601, 613.

**14.** *See Schlesinger v. Reservists to Stop the War,* 418 U.S. 208, 227, 94 S.Ct. 2925, 2935, 41 L.Ed.2d 706, 722 (1974); *United States v. Richardson,* 418 U.S. 166, 179, 94 S.Ct. 2940, 2947, 41 L.Ed.2d 678, 689 (1974).

**15.** Art. VII, Sec. 16 of the Alaska Constitution provides:
> *Governor's Authority.* The governor shall be responsible for the faithful execution of the laws. He may, by appropriate court action or proceeding brought in the name of the State, enforce compliance with any constitutional or legislative mandate, or restrain violation of any constitutional or legislative power, duty, or right by any officer, department, or agency of the State or any of its political subdivisions. This authority shall not be construed to authorize any action or proceeding against the legislature.

Neither party has drawn attention to this provision of the Alaska Constitution. As stated by Justice Rabinowitz in *Alyeska Ski Corporation v. Holdsworth,* 426 P.2d at 1013–14 n. 28: None of the briefs before us make any reference to this provision of our constitution and to its possible impact on the standing issue in the case at bar. In such circumstances we will await a more appropriate occasion to

controversy is clearly adverse to that represented by plaintiffs.

In view of the totality of the circumstances and the strong policy favoring review of alleged specific constitutional violations by state officials,[16] we find it appropriate to reach the merits of this controversy.

## II. THE CONSTITUTIONALITY OF THE PROPOSED TRANSFER OF MINERAL RIGHTS

In 1955, the Territory of Alaska, through its legislature, provided for a constitutional convention.[17] Elected delegates adopted a Constitution on February 5, 1956, which was ratified by the people of Alaska on April 24, 1956. This Constitution adopted by the people of Alaska served as the basis for subsequent petitions to Congress for statehood and constituted an offer to accept the privileges and responsibilities of that status in accordance with its terms.[18]

Throughout the process of drafting the Constitution and its adoption, there was considerable public controversy surrounding the issue of federal control over Alaska's power to dispose of its mineral resources. In statehood legislation for other states, Congress had limited land grants to nonmineral lands. Public lands, which were known to be chiefly valuable for commercial mineral production at the time of the grants, were retained in federal ownership for management and disposition under a theoretically unified system of federal mineral law. In part to avoid the litigation over titles which had resulted from this policy,[19] Congress passed the School Lands Act of 1927, 43 U.S.C. § 870. This act extended the original statehood land grants to embrace lands mineral in character. These additional grants, however, were made subject to a mineral alienation condition which prohibited state disposal of land without a reservation of minerals and permitted a forfeiture action instituted by the Attorney General on behalf of the United States in the event of such disposal [43 U.S.C. § 870(b)].

Although the constitutions of most states were written after passage by Congress of the relevant enabling acts, Alaska's Constitution was drafted in the absence of a pre-existing act. While the delegates were therefore unsure of the particular restrictive language which might be chosen by Congress, they were aware of the history of federal control over state disposition of mineral lands and the likelihood that the United States would insist on retaining its usual powers. To many of the delegates and the people of the state, these restrictions were unpopular.[20]

interpret this portion of Alaska's constitution.

16. See, e. g., United States Smelt., Ref. & Mining Co. v. Local Bound. Comm'n, 489 P.2d 140, 143 (Alaska 1971).

17. The historical discussion in this opinion is drawn from the following sources: V. Fischer, Alaska's Constitutional Convention (Anchorage, Univ. of Alaska Press, 1975); C. Naske, An Interpretative History of Alaskan Statehood (Alaska Northwest Publishing Co., 1973); C. Naske, "103,350,000 Acres," II Alaska Journal 2 (Autumn 1972); Alaska Constitutional Convention Proceedings (Juneau, Alaska Legislative Council); I Public Administration Service, Constitutional Studies 44–70.

18. Metlakatla Indian Community, Annette Island Reserve v. Egan, 362 P.2d 901, 909 (Alaska 1961), rev'd in part on other grounds, sub nom., Metlakatla Indian Community v. Egan, 369 U.S. 45, 82 S.Ct. 552, 7 L.Ed.2d 562 (1962), aff'd in part on other grounds, sub. nom. Or-

ganized Village of Kake v. Egan, 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962).

19. See, e. g., Wyoming v. United States, 255 U.S. 489, 41 S.Ct. 393, 65 L.Ed. 742 (1921); United States v. Sweet, 245 U.S. 563, 38 S.Ct. 193, 62 L.Ed.2d 473 (1918); Deffeback v. Hawke, 115 U.S. 392, 6 S.Ct. 95, 29 L.Ed. 423 (1885).

20. See Alaska Constitutional Convention Proceedings, at 3001 and 3062. For example, Delegate White of the Committee on Resources told the convention:

of all the hundreds of people I have talked to about . . . [the mineral alienation provision in the enabling act under consideration by Congress], . . . I can count on something less than one hand those who like the requirement that the state will have to retain title to its minerals and may only lease them. 4 Alaska Constitutional Convention Proceedings at 3001. He later explained that the provision was:

On the other hand, the need to protect the resources of the state against exploitation and the pressure of special interest groups was emphasized at the outset of the convention in an address by E. L. Bartlett, at that time Alaska's Delegate to Congress.[21] A suggested provision on natural resources drafted by the Public Administration Services, a national consulting organization retained to provide research services to the Alaska Statehood Committee, would have required a reservation to the state of all the minerals in lands sold, granted, deeded or patented by the state.[22] In drafting the provision, which became Art. VIII, Sec. 9, however, the delegates rejected the view that absolute restraints on alienation of mineral rights should be made an affirmative part of the Constitution. Instead, they provided that:

> . . . All sales or grants shall contain such reservations to the State of all resources as may be required by Congress or the State and shall provide for access to these resources. Reservation of access shall not unnecessarily impair the owners' use, prevent the control of trespass, or preclude compensation for damages.[23]

The delegates thus clearly elected not to include specific restrictions on alienation of mineral rights in the Constitution. Had they intended that such restrictions be constitutionally mandated, it would have been a simple matter to spell them out in the same careful manner as were so many other provisions of the Constitution. It is without dispute that a state in its constitution may impose more stringent restrictions on the disposal of state lands than those required by Congress. In fact, there is no federal requirement that a state dispose of its lands at all. In the event that the

delegates were concerned that specific restrictions drafted into the Constitution might not satisfy Congressional requirements for Alaska's admission to the Union, a provision could have been added calling for such additional restrictions as might be required by Congress.

What we have said with reference to Art. VIII, Sec. 9 applies with equal force to the provisions of Art. XII, Sec. 13, which specifies:

> All provisions of the act admitting Alaska to the Union which reserve rights or powers to the United States, as well as those prescribing the terms or conditions of the grants of lands or other property, are consented to fully by the State and its people.

No specific limitations to mineral alienation were set forth in the Constitution by this provision. Nor were any terms or conditions incorporated by reference to an existing statute or code since the Statehood Act was yet to be enacted by Congress. Art. XII, Sec. 13 is similar to Art. VIII, Sec. 9 in expressing advance consent to terms or conditions which might be required by Congress as a condition to admission of Alaska to the Union. It did not, however, embed any particular restrictions into the state Constitution.

■ While we believe there can be no serious question as to the intent of the delegates in drafting Art. VIII, Sec. 9, we are cognizant that a state constitution differs from a legislative act. In construing a legislative act, we need only look to the intent of the members who enacted it. A constitutional provision, however, must be ratified by the voters, and it is therefore also necessary to look to the meaning that the voters would have placed on its provi-

---

far and away the most unpopular among the people of Alaska and not necessarily just among the mining industry. It is unpopular among the homesteaders, the man in the street and everyone I have talked to. . . .
*Id.* at 3062.

**21.** *See,* Fischer, *supra* at 134. Mr. Bartlett later served with distinction as senior United States Senator for Alaska.

**22.** P.A.S. Proposal, Vol. 1, at 59, Alaska Constitutional Convention Proceedings. Provision was made for alienating mineral rights by general law in the case of homesteads and lesser acreage.

**23.** Art. VIII, Sec. 9, Alaska Constitution.

sions.[24] While voters were probably not privy to the comments of the delegates in adopting the provision, they were made aware of its purpose in unambiguous language by *A Report to the People of Alaska from the Alaskan Constitutional Convention* which was widely distributed. The report explained the Constitution's treatment of mineral reservations as:

> a direct reflection of Congressional thinking, . . . . The Constitution . . gives flexible treatment to the subject *in order that amendment will not be necessary if Congressional thinking should change.* (emphasis added) [25]

The voters were thus advised that restrictions on alienation of mineral rights could be lifted without the necessity of a constitutional amendment if Congress so permitted. We can envision no more cogent expression of the intent of the drafters and of those voting for ratification of the Constitution.

■ We are compelled to hold that Art. VIII, Sec. 9 and Art. XII, Sec. 13 do not contain constitutional restraints on alienation of mineral rights. The provisions merely leave the decision as to whether to require such reservations to Congress and the state's legislature. Art. VIII, Sec. 9 and Art. XII, Sec. 13 of the state Constitution thus impose no impediment to an exchange of land authorized by Congress and the state legislature even though the exchange involves a conveyance of mineral rights by the state.

This case, however, is not so simply resolved. Alaskans ratified the Constitution on April 24, 1956, almost three years prior to achieving statehood.[26] The Alaska Statehood Act was signed into law on July 7, 1958. Section 6(i) of the Act states:

> (i) All grants made or confirmed under this Act shall include mineral deposits. The grants of mineral lands to the State of Alaska under subsections (a) and (b) of this section are made upon the express conditions that all sales, grants, deeds, or patents for any of the mineral lands so granted shall be subject to and contain a reservation to the State of all of the minerals in the lands so sold, granted, deeded, or patented, together with the right to prospect for, mine, and remove the same. Mineral deposits in such lands shall be subject to lease by the State as the State legislature may direct: *Provided,* That any lands or minerals hereafter disposed of contrary to the provisions of this section shall be forfeited to the United States by appropriate proceedings instituted by the Attorney General for that purpose in the United States District Court for the District of Alaska.

The lands to be selected by the state included mineral lands so as to be consistent with the rights granted other states as a result of the School Lands Act of 1927, 43 U.S.C. § 870. The restrictions placed by Congress on alienation of Alaska's lands were of the same import as those set forth in that Act and applicable to the other states.

Sec. 8(b) of the Statehood Act required that an election be held in Alaska submitting to the voters three propositions.[27] We

---

**24.** *People ex rel. Watseka Telephone Co. v. Emmerson,* 302 Ill. 300, 134 N.E. 707 (1922); *State ex rel. Heimberger v. Board of Curators,* 268 Mo. 598, 188 S.W. 128 (1916); *Steele Hopkins & Miller Co. v. Miller,* 92 Ohio St. 115, 110 N.E. 648 (1915); *Scribner v. State,* 9 Okl.Cr. 465, 132 P. 933, 934 (1913); *Rasmussen v. Baker,* 7 Wyo. 117, 50 P. 819 (Wyo.1897).

**25.** Proposed Constitution for the State of Alaska, A Report to the People of Alaska from the Alaska Constitutional Convention at 3 (College, Alaska 1956). The history and significance of this document is discussed in Fischer, *supra* at 173–74.

**26.** Alaska became a state on January 3, 1959, (Presidential Proclamation of President Eisenhower, January 3, 1959).

**27.** Alaska Statehood Act Sec. 8(b) provides in part:
(b) At an election designated by proclamation of the Governor of Alaska, which may be the *general election held pursuant to subsection (a)* of this section, or a Territorial general election, or a special election, there shall be submitted to the electors qualified to vote in said election, for adoption or rejection, by separate ballot on each, the following propositions:
"(1) Shall Alaska immediately be admitted into the Union as a State?

are here concerned only with the third proposition which required the consent by the state and its people to provisions of the Alaska Statehood Act

reserving rights or powers to the United States, as well as those prescribing the terms or conditions of the grants of lands or other property therein made to the State of Alaska.

The people of Alaska voted in favor of all three of the propositions at the election held on August 26, 1958.[28] Included in Sec. 8(b) of the Statehood Act, although not in the proposition submitted to the voters, was the provision that in the event that the three propositions were adopted by a majority vote, "the proposed constitution of the proposed State of Alaska . . . shall be deemed amended accordingly". Since the propositions were adopted, it is plaintiffs' position that the Alaska Constitution was thereby amended to include "the terms or conditions of the grants of land" set forth in Sec. 6(i) of the Statehood Act.

■ The Constitution of the State of Alaska, however, provides only two means for its amendment. Art. XIII, Sec. 1 authorizes such amendments by a two-third vote of each house of the legislature thereafter approved by a majority vote at the next statewide election. Art. XIII, Sec. 4 provides for amendments by a constitutional convention subject to ratification by the people. There was no state legislature in existence at the time of passage of the Statehood Act, and the Territorial legislature never approved an amendment incorporating the restrictions of Sec. 6(i) of the Statehood Act into the Alaska Constitution. Nor was any constitutional convention called to act on the matter. The Alaska Constitution may not be amended by popular vote alone, without prior action by either the legislature or a constitutional convention. It is thus clear that the Alaska Constitution was not amended in the only two ways permitted by that document. It is further beyond dispute that the United States Congress has no power to amend a state's constitution.[29]

■ The dissent would hold that the voters approved an amendment to the Constitution, although neither the language nor the fact of this amendment were indicated on the ballot. If Congress had desired that the state Constitution contain restrictions on alienation, the enabling act could have required that an appropriate amendment be enacted.

■ The dissent also contends that Art. XIII, Secs. 1 and 4 of the Alaska Constitution specifying means of amendment remained inoperative until Alaska was admitted into the Union. The same may be said for the entire Constitution. Just as the Constitution was agreed upon

"(2) The boundaries of the State of Alaska shall be as prescribed in the Act of Congress ·approved _____ and all claims of this State to any areas of land or sea outside the boundaries so prescribed are hereby irrevocably relinquished to the United States.
"(3) All provisions of the Act of Congress approved _____ reserving rights or powers to the United States, as well as those prescribing the terms or conditions of the grants of lands or other property therein made to the State of Alaska, are consented to fully by said State and its people."
In the event each of the foregoing propositions is adopted at said election by a majority of the legal votes cast on said submission, the proposed constitution of the proposed State of Alaska, ratified by the people at the election held on April 24, 1956, shall be deemed amended accordingly. In the event any one of the foregoing propositions is not adopted at said election by a majority of the legal votes cast on said submission, the provisions of this Act shall thereupon cease to be effective.

28. C. Naske, An Interpretative History of Alaskan Statehood, at 167.

29. *See Coyle v. Smith*, 221 U.S. 559, 568–71, 31 S.Ct. 688, 690–91, 55 L.Ed. 853, 858–59 (1911); *Permoli v. Municipality No. 1*, 44 U.S. (3 How.) 589, 609–10, 11 L.Ed. 739, 748 (1845); *Boeing Aircraft Co. v. Reconstruction Finance Corp.*, 25 Wash.2d 652, 171 P.2d 838 at 842. Congress is limited to the powers enumerated in the Constitution and cannot invade an area of sovereignty reserved exclusively to the states by tampering with "essentially and peculiarly state powers". *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245, 44 U.S.L.W. 4974 (1976).

and adopted prior to Alaska's admission to the Union, amendments could have been enacted in accordance with its provisions had Congress so required. The amendments, like the Constitution itself, would become effective upon Alaska's admission to the Union. Congress, however, imposed no such condition to admission. It seems self-evident that the Congressional restraints on alienation were intended by Congress to be binding only to the extent required by that body. This also was the intent of those who agreed upon and adopted the Alaska Constitution by vote.

Apparently realizing the flaws in an argument that the Constitution was amended by the vote approving the propositions set forth in Sec. 8(b) of the Statehood Act, plaintiffs rely on the creation of a compact between the future state and Congress. A compact is merely an agreement or contract usually applied with reference to nations or sovereign states.[30] The plaintiffs argue that such a compact arose as the result of adoption of the Alaska Constitution's provisions of Art. VIII, Sec. 9 and Art. XII, Sec. 13 agreeing that all sales or grants of lands be subject to such reservations as Congress shall require and the federal imposition of restrictions on alienation of mineral rights subsequently set forth in Sec. 6(i) of the Statehood Act.

■■■■■■ There is authority to the effect that for a compact to arise, there must be identical provisions in the state constitution and the federal act.[31] While a comparison of the provisions in the two documents may be of assistance to determine whether an agreement was reached, we do not rely on any such narrow doctrine as would require identical language. Here it is clear that Alaskans by ratification of the Constitution including the provisions of Art. VIII, Sec. 9 and Art. XII, Sec. 13; and again, separate-

ly, by approving proposition 3 of Sec. 8(b) of the Statehood Act, agreed to be bound by restrictions on alienability of land imposed by the federal government. This constituted a compact. The real issue is whether after Congress has given its consent to a change in terms, the compact may be altered only by a state constitutional amendment.

Prior compacts between most new states other than Alaska and Congress arose differently because the federal enabling acts were written prior to the constitutions of the new states.[32] As a result, the constitutions were able to mirror the terms of the enabling act. Even under those circumstances where the provisions of the federal enabling act were actually incorporated into the state constitution, it has been held that the compact so reached may be altered without the necessity of a state constitutional amendment.

The leading case is *Boeing Aircraft Co. v. Reconstruction Finance Corp.*, 25 Wash.2d 652, 171 P.2d 838 (1946), *appeal dismissed, sub nom. Boeing Aircraft Co. v. King County, Washington,* 330 U.S. 803, 67 S.Ct. 972, 91 L.Ed. 1262 (1947). The Washington enabling act required that the state constitutional convention provide

> by ordinances irrevocable without the consent of the United States, and the people of said States . . . that no taxes shall be imposed by the State(s) on lands or property therein belonging to or which may hereafter be purchased by the United States or reserved for its use.[33]

The Constitution of the State of Washington, Art. XXVI provided:

> Compact With the United States—The following ordinance shall be irrevocable without the consent of the United States and the people of this state:—

---

**30.** Black's Law Dictionary at 351 (4th ed. rev. 1957).

**31.** *Metlakatla Indian Community, Annette Island Reserve v. Egan,* 362 P.2d 901, 908–09 (Alaska 1961).

**32.** Hawaii's Constitution was drafted prior to the act providing for its admission to the Union, Public Law 86 3, March 18, 1959. There appears to be no Hawaii decision pertaining to its compact with the United States.

**33.** Act of February 22, 1889 (Session II, Ch. 180), 25 Stat. 676.

" * * * that no taxes shall be imposed by the state on lands or property therein belonging to or which may be hereafter purchased by the United States or reserved for use: * * *."[34]

Thereafter, the United States authorized state taxation of property owned by the Reconstruction Finance Corporation to the same extent according to its value, as other real property is taxed.[35] The Washington Legislature passed a law authorizing taxation of the property of the United States and its agencies "whenever and in such manner as such taxation may be authorized or permitted under the laws of the United States".[36]

A declaratory judgment action was commenced contesting the validity of the county taxes imposed on the Reconstruction Finance Corporation property which had been leased to Boeing Aircraft Co. Under the terms of the lease, Boeing was required to pay any taxes lawfully imposed on the property.

At issue was whether, without a state constitutional amendment, the Washington Legislature could authorize the taxation of United States' property. The compact between the United States and Washington prohibited such taxation, and that prohibition, unlike the restrictions on alienation of land here in dispute, was specifically written into the Washington Constitution. Again unlike the Alaskan situation, both the federal act and the state constitutional provisions stated that the prohibition against taxation was irrevocable "without the consent of the United States *and the people of this state*" (emphasis added).

The Washington Supreme Court first looked to the intent of the framers of its constitution and that of Congress. The court quoted with approval "that the polestar in the construction of Constitutions is the intention of the makers and adopters".[37] It concluded that:

It is an inescapable conclusion that the framers of the constitution and the Congress of the United States intended that any agreement allowing Federal property to be taxed, would be arrived at by the passage of laws by the Congress of the United States and the legislature of the state of Washington. It is clearly apparent that the makers of our constitution had in mind that the people would speak through the mouth of the legislature in agreeing that the Federal property might be taxed.[38]

If confronted with the issue facing the Washington court, we would have considerable difficulty in reaching the same conclusion. The exemption was expressly set forth in the state constitution which provided that it was irrevocable without the consent of the United States and the "people" of the state. It is clear, however, that the provision was inserted in the state constitution solely for the benefit of the federal government. There thus is compelling reason to believe that the framers of the state constitution and those ratifying it intended to be free of that restriction as soon as relieved of its burdens by Congress. Thus, the Washington Supreme Court in *Boeing, supra,* was probably following the intent of Congress and the state when they entered into the compact. The case has been followed without criticism.[39]

**34.** 171 P.2d at 841.

**35.** *Boeing Aircraft Co. v. Reconstruction Finance Corp., supra.* at 171 P.2d 840–41.

**36.** Rem.Supp.1945 Sec. 11150–1.

**37.** 171 P.2d at 843, *quoting* 11 Am.Jur., Constitutional Law § 61.

**38.** *Id.*

**39.** *See State v. Paul*, 53 Wash.2d 789, 337 P.2d 33 (1959) (constitutional amendment unnecessary to assert jurisdiction over Indians, despite express constitutional disclaimer, where Congress consents); *accord, Quinault Tribe of Indians v. Gallagher*, 368 F.2d 648, 657 (9th Cir. 1966), *cert. denied*, 387 U.S. 907, 87 S.Ct. 1684, 18 L.Ed.2d 626 (1976) (relying on Washington law); *Tonasket v. State*, 84 Wash.2d 164, 525 P.2d 744, 752 (1974); *Makah Indian Tribe v. State*, 76 Wash.2d 485, 457 P.2d 590, 593 (1969), *appeal dismissed*, 397 U.S. 316, 90 S.Ct. 1115, 25 L.Ed.2d 335 (1970). *See also State ex rel. McDonald v. District Ct. of 4th J. D.*, 159 Mont. 156, 496 P.2d 78, 82 (1972) (relying on *Paul*).

The dissent refers to *State ex rel. Interstate Stream Comm'n v. Reynolds*, 71 N.M. 389, 378 P.2d 622 (1963). The enabling act for New Mexico provided that certain lands be held in trust, and required that funds from those lands be subject to the same trust. By Art. XXI, Sec. 9 of the New Mexico Constitution, express consent was given to that provision. A question arose as to whether such trust funds were being used for the trust purposes. The New Mexico court found that the funds were being used for the designated purposes. The decision contains language to the effect that the enabling act provisions were incorporated into the state constitution. The case is readily distinguishable. First, the New Mexico Constitution was enacted after the enabling act and expressly consented to known provisions. Alaska's Constitution was enacted prior to the enactment of the enabling act, and thus incorporated no specific provisions. Second, the New Mexico court did not address the question here presented as it held that the funds were appropriated for the trust purposes. To be comparable to the Alaska case, Congress would have had to grant an express alteration of its earlier restrictions on the use of the funds which would thereafter have been appropriated for such altered purposes. That was the exact question involved in *Boeing*, but no such issue was presented to the New Mexico court.

The reasons for permitting changes in the Alaskan compact without the necessity of a constitutional amendment are much more compelling than in the *Boeing* case. The Alaska Constitution did not contain any specific restrictions on alienation but merely a consent to be bound by such reservations as would be required by Congress. A strong argument may therefore be made that all that was required to release the restrictions was Congressional consent. Once this consent was secured, the Alaska Legislature, in agreeing to the disposition of the land and mineral rights, was not violating any specific provision of the Alaska Constitution.

In *Starr v. Hagglund*, 374 P.2d 316 (Alaska 1962), a divided Alaska Supreme Court approved a change of the provision in the Constitution designating Juneau as the capital by statute or initiative, rather than by constitutional amendment. The decision was based on the fact that the provision was in an article of the constitution entitled "Schedule of Transitional Measures", and on certain remarks made by the Chairman of the Committee on Ordinances and Transitional Measures. Thus, although the capital provision appeared in the body of the Constitution, it was permitted to be changed without the necessity of a constitutional amendment.

We here do not go that far since there is no provision in the Alaska Constitution restricting alienability of land. Providing for such restrictions is left by that document to the determination of Congress and the state. We hold that a constitutional amendment is not mandated, and that legislative approval of the Cook Inlet land exchange is sufficient once Congress consented to lifting the restrictions imposed against alienation of mineral rights.[40]

### III. LOCAL AND SPECIAL LEGISLATION

Plaintiffs argue that Chapter 19, SLA 1976 violates the constitutional prohibition on local and special legislation, Art. II, Sec. 19,[41] because it affects only a limited geographical region of the state.

---

**40.** Plaintiffs present policy arguments as to why they believe this exchange is against the public interest. These arguments, however, were properly presented to the Alaska Public Land Commission and the legislature. Since we find no constitutional infirmity, the political decision as to the wisdom of the exchange is not one for the courts. *See DeArmond v. Alaska State Development Corp.*, 376 P.2d 717, 721 (Alaska 1962); *Coleman v. Miller*, 307 U.S. 433, 454–55, 59 S.Ct. 972, 982, 83 L.Ed. 1385, 1396–97 (1939).

**41.** Alaska Constitution, Art. II, Sec. 19 provides in part:

*Local or Special Acts.* The legislature shall pass no local or special act if a general act can be made applicable. Whether a general act can be made applicable shall be subject to judicial determination.

Additionally, they claim that the bill is invalid on the ground that it waives the provisions of AS 38.05.125 which restrict the state's right to alienate minerals and AS 38.95.060(c) which authorizes exchanges of land with Native corporations for equal value.[42] We find no merit in these contentions and hold that Chapter 19, SLA 1976 is a general act, addressing a matter which is unique, but of statewide concern. A valid general act may effectively repeal or supercede provisions of prior acts such as AS 38.05.125 and AS 38.95.060.

■■■■ The test to be employed in determining whether legislation contravenes Art. II, Sec. 19 is substantially the same as that applicable to nonsuspect classifications challenged as violative of equal protection.[43] Examining both the legislative goals and the means used to advance them, we must determine whether the legislation bears a "fair and substantial relationship" to legitimate purposes.[44] If this standard is satisfied, the bill will not be invalid because of incidental local or private advantages.[45] Legislation need not operate evenly in all parts of the state to avoid being classified as local or special.[46]

■■■■ Ample evidence in the record supports our conclusion that Chapter 19, SLA 1976 is designed to facilitate statewide land use management and to resolve a host of pressing legal issues arising in the context of ANCSA.[47] The conflict between Cook and the government concerning the adequacy of withdrawals for Native selection implicated both future state selections and existing state patents. Clouds on title could have resulted in protracted litigation and impaired effective planning for a variety of state needs.

In a report prepared for use by the House and Senate Committees on Natural Resources in evaluating Chapter 19, SLA 1976 [48] the Federal-State Land Planning Commission summarized these problems and considered a variety of alternative resolutions. They concluded that the land exchange represented the most desirable and advantageous solution to the multiple issues confronting the state as a whole. The exchange is a response to a unique federal offer which affords the state the opportunity to secure free of challenge, the vast bulk of lands previously patented to it. In addition, it permits state selection of additional lands which were previously unavailable

---

**42.** Plaintiffs also claim that Chapter 19, SLA 1976 unconstitutionally discriminates in favor of a particular Native corporation as against all other grantees of state land and, in particular, as against all other Native corporations. Although the question of standing was not specifically argued in connection with this claim, we note that Mr. Lewis and Mr. Galliet lack the requisite adversity to raise this argument. Plaintiffs have not alleged that they are members of a Native corporation or grantees of state land, nor do they explain why any of those allegedly discriminated against by the bill are unable to vindicate their own rights.

**43.** *Boucher v. Engstrom,* 528 P.2d 456, 463 n.25 (Alaska 1974).

**44.** *Isakson v. Rickey,* 550 P.2d 359, 361–63 (Alaska 1976). Our previous decisions concerning local and special legislation—*Abrams v. State,* 534 P.2d 91 (Alaska 1975); *Boucher v. Engstrom, supra*; and *Walters v. Cease,* 394 P.2d 670 (Alaska 1964)—were decided before we adopted the more stringent equal protection test set forth in *Isakson.* We extend our dicta in *Boucher v. Engstrom, supra,* and find the *Isakson* standard applicable here.

**45.** *Suber v. Alaska State Bond Committee,* 414 P.2d 546, 552 (Alaska 1966) (adjustment plan to aid mortgagors and mortgagees of homes damaged in earthquake not violative of equal protection).

**46.** *Boucher v. Engstrom, supra* 528 P.2d 456 at 463; *Abrams v. State, supra,* 534 P.2d at 94.

**47.** Under the traditional rational basis test, we refused to set aside the legislative findings unless they clearly lacked any reasonable basis in fact. *See, e. g., DeArmond v. Alaska State Development Corp.,* 376 P.2d 717, 721 (Alaska 1962), cited in *Ault v. Alaska State Mortgage Ass'n,* 387 P.2d 698, 701 (Alaska 1963). Under the new equal protection standard adopted in *Isakson, supra,* 550 P.2d at 362, we will not "hypothesize legislation". The voluminous documentary evidence in the record here precludes the need for conjecture.

**48.** *See* Cook Inlet Report, Report of Federal-State Land Use Planning Commission (Anchorage, March 6, 1976).

under the statehood act, including certain key public purpose tracts in the Anchorage area.

■ Plaintiffs raise opposing policy arguments. They consider the exchange to be a "give away" of the state's heritage. Absent a constitutional infirmity, however, the balancing of such arguments is peculiarly a legislative function. As far as the constitutional issue is concerned, we find a "fair and substantial relationship" between permissible legislative purposes and the means used to advance them.[49]

Our previous decisions present no bar to our holding here. Plaintiffs point to *Abrams, supra*, as determinative of the instant case. There we considered a statute providing for the creation of an Eagle River-Chugiak Borough in a manner different from that set forth in a comprehensive state scheme for incorporating new boroughs. Those seeking to uphold the statute in *Abrams*, however, failed to offer evidence indicating any valid reason for special incorporation procedures, applicable only to the proposed new borough.[50] By contrast, the problems of the Cook Inlet region and their relationship to broader state concerns present a unique situation calling for unique treatment. No similar set of facts is known or expected to exist, and the legislation is thus as broad as the conditions to which it responds.[51] We therefore hold that Chapter 19, SLA 1976 is a general legislative treatment of complex problems of pressing importance and of statewide concern.

In summary, we hold that the plaintiffs have standing to contest the validity of Chapter 19, SLA 1976 under the facts of this case. We further hold that Chapter 19, SLA 1976 is constitutional since there is no constitutional prohibition against alienation of mineral rights which precludes this land exchange, and the act does not conflict with constitutional prohibitions against special or local legislation.

The injunction issued in the superior court is therefore vacated, and the declaratory judgment of the superior court reversed.

RABINOWITZ, Justice, dissenting in part.

I am in agreement with the majority's resolution of the standing and local or special legislation issues, as well as the majority's conclusion that it is unnecessary to pass upon the contention that the United States is an indispensable party to this litigation. My disagreement with the majority lies in the court's disposition of the question of whether the proposed transfer of mineral rights is constitutionally permissible.

Before explaining why I find I cannot agree with the court's holdings that in the particular circumstances of this case a constitutional amendment is not mandated and that "legislative approval of the Cook Inlet land exchange is sufficient once Congress consented to lifting the restrictions imposed against alienation of mineral rights," I think it appropriate to clarify my position in relation to several rather peripheral aspects of this appeal.

First, although I reach the same legal conclusion that appellees would have the court reach in this appeal, I cannot subscribe to appellees' assertions of wrongdoing on the part of members of the executive branch of Alaska's government. In this regard I think portions of appellees' brief embody rather intemperate and reckless accusations. More to the point, I have as-

---

**49.** *See also Boucher v. Engstrom, supra*, where we found that statewide interest in the location of a new capital was sufficient to validate an *initiative relocation proposal which excluded* Fairbanks and Anchorage as potential sites.

**50.** For similar reasons, we found the borough incorporation procedures at issue in *Walters v. Cease*, 394 P.2d 670 (Alaska 1964), to be local and special legislation.

**51.** For other jurisdictions which have upheld laws responding to unique situations in the context of similar constitutional challenges, *see e. g., State v. Reynolds*, 71 N.M. 389, 378 P.2d 622 at 626 (1963); *County of Cameron v. Wilson*, 160 Tex. 25, 326 S.W.2d 162, 165 (1959); *Berry v. Milliken*, 234 S.C. 518, 109 S.E.2d 354, 356 (1959); *State v. Hodgson*, 183 Kan. 272, 326 P.2d 752, 758 (1958).

sumed for purposes of my analysis of the constitutional question here that all parties involved in this historic proposed land exchange have acted in utmost good faith and that the executive branch of Alaska's government has obtained exchange terms which are in fact entirely fair in relation to the interests of the people of the State of Alaska. Secondly, I am in full accord with the attempts on the part of both the federal and state governments to work out an equitable solution with Cook Inlet Region, Inc. in order to effectuate the provisions of the Alaska Native Claims Settlement Act. For it is my belief that it is essential that equitable settlement implementations be achieved of the respective land claims of Native Alaskans. Nevertheless, Alaska's Constitution has vested the judicial power of the state in the Supreme Court of Alaska.[1] A concomitant of this power is the necessity of interpreting Alaska's Constitution, when called upon, in accordance with neutral principles of constitutional analysis. For regardless of whom the particular litigants may be, Alaska's Constitution provides "that all persons are equal and entitled to equal rights, opportunities, and protection under the law."[2] Thus, with these preliminary matters in mind, I now turn to the question which the majority has termed "The Constitutionality of the Proposed Transfer of Mineral Rights."

Article IV, section 3 of the Constitution of the United States provides in part that "New states may be admitted by the Congress into this Union . . . ."[3] As the majority notes, the sequential procedural stages prior to the actual admission of the Territory of Alaska into the Union are unusual. Unlike the sequencing of events in most previous admissions, Alaska's Constitution was adopted by the constitutional convention and ratified by the people of the Territory of Alaska prior to the enactment by the United States Congress of enabling legislation. In *Metlakatla Indian Community, Annette Island Reserve v. Egan,* this court viewed the pre-statehood efforts on the part of the Territory of Alaska in the following manner: "This constitution served as a basis for subsequent petitions to Congress for Statehood and can be considered as an offer to accept the privileges and responsibilities of that status in accordance with its terms."[4] Keeping in mind the power of Congress to admit new states into the Union and the unusual circumstance that the Territory of Alaska adopted a proposed state constitution before Congress had passed enabling legislation, I now address the extremely difficult question presented in determining the legal effect of the provisions of the Statehood Act and Alaska Constitution which are at issue in this appeal.

In *Coyle v. Smith,* 221 U.S. 559, 31 S.Ct. 688, 55 L.Ed. 853 (1911), the Supreme Court of the United States was faced with a question involving the ability of a state to act in contradiction to relevant provisions of its enabling act. The Oklahoma Enabling Act contained numerous restrictions, among them, that the state capital was to be temporarily located in Guthrie. The enabling act contained two types of restrictions, those required to be inserted in the state constitution and those which the Oklahoma constitutional convention was required to accept by "ordinance irrevocable." The state capital provision was of the latter type. In upholding the Oklahoma legisla-

---

1. Article IV, section 1 of the Alaska Constitution reads in part: "The judicial power of the State is vested in a supreme court, a superior court, and the courts established by the legislature."

2. Article I, section 1, Alaska Constitution.

3. Article IV, section 4 of the Constitution of the United States further provides that: "The United States shall guarantee to every State in this Union a Republican Form of Government . . . ."

4. *Metlakatla Indian Community, Annette Island Reserve v. Egan,* 362 P.2d 901, at 908–09 (Alaska 1961), *rev'd in part on other grounds, sub nom. Metlakatla Indian Community v. Egan,* 369 U.S. 45, 82 S.Ct. 552, 7 L.Ed.2d 562 (1962), *aff'd in part on other grounds, sub nom. Organized Village of Kake v. Egan,* 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962).

ture's power to transfer the capital to Oklahoma City, the Supreme Court established three subdivisions with respect to restrictions insisted upon by Congress in enabling legislation. First, are conditions which are fulfilled by the admission of the state; second are "compacts or affirmative legislation intended to operate *in futuro,* which are within the scope of the conceded powers of Congress over the subject";[5] third, are the compacts which restrict the powers of a new state in matters that would otherwise be exclusively within the sphere of state power. The Supreme Court stated:

> As to requirements in such enabling acts as relate only to the contents of the Constitution for the proposed new state, little need to be said. The constitutional provision concerning the admission of new states is not a mandate, but a power to be exercised with discretion. From this alone it would follow that Congress may require, under penalty of denying admission, that the organic law of a new state at the time of admission shall be such as to meet its approval. A Constitution thus supervised by Congress would, after all, be a Constitution of a state, and as such subject to alteration and amendment by the state after admission. Its force would be that of a state Constitution, and not that of an act of Congress.[6]

The Supreme Court then went on to hold that so far as Congress was attempting to deprive the state of any power which was constitutionally possessed by other states, the attempt was invalid. The Court stated:

The plain deduction from this case is that when a new state is admitted into the Union, it is so admitted with all of the powers of sovereignty and jurisdiction which pertain to the original states, and that such powers may not be constitutionally diminished, impaired, or shorn away by any conditions, compacts, or stipulations embraced in the act under which the new state came into the Union, which would not be valid and effectual if the subject of congressional legislation after admission.[7]

Thus, it is clear that Congress is empowered to insist on certain inclusions in the particular state's constitution as a prerequisite to admission; what is forbidden to Congress is regulation which impairs "the essence of the power of statehood."[8] In *Coyle v. Smith* the Supreme Court concluded that the restriction on moving the capital of Oklahoma could be ignored by the new state since it related to a power which was traditionally within the state's ambit of powers.

As I analyze the issue, the restrictions contained in section 6(i) of the Statehood Act on the State of Alaska's power to alienate mineral interests in state lands comes within the *Coyle* category relating to constitutional conditions imposed as a prerequisite to admission. In the usual case in which an enabling act was passed prior to the meeting of the state's constitutional convention, Congress was able to insist on the inclusion of various provisions in the state's proposed constitution.[9] Inasmuch as

5. *Coyle v. Smith,* 221 U.S. 559, 568, 31 S.Ct. 688, 690, 55 L.Ed. 853, 858 (1911).

6. *Id.*

7. *Id.* at 573, 31 S.Ct. at 692, 55 L.Ed. at 860.

8. *Interior Airways, Inc. v. Wien Alaska Airlines, Inc.,* 188 F.Supp. 107, 112 (D.Alaska 1960).

9. Professor Westel Willoughby discusses the subject of admissions of new states as follows:

> The Constitution, without distinguishing between the original and new States, defines the political privileges which the States are to enjoy, and declares that all powers not granted to the United States shall be considered as reserved 'to the States.' From this it almost irresistibly follows that Congress has not the right to provide that certain members of the Union, possessing full statehood, shall have their constitutional competences less than those of their sister States. According to this, then, though Congress may exact of Territories whatever conditions it sees fit as requirements precedent to their admission as States, when admitted as such, it cannot deny to them any of the privileges and immunities which the other Commonwealths enjoy.

> The principle of the equality of the States had its origin before the adoption of the Constitution itself. In the acts of cession by the

Alaska's constitutional convention was held long before passage by Congress of enabling legislation, Congress was unable to exercise its power to insist that the proposed constitution contain specific provisions. However, it did insist that the people of the proposed State of Alaska adopt, among other explicit restrictions and conditions, the restrictions contained in section 6(i) of the Statehood Act, and that upon passage by the people, the proposed constitution of the State of Alaska would be deemed amended. More particularly, section 6(i) of the Alaska Statehood Act provides in part that:

> All grants made or confirmed under this Act shall include mineral deposits. The grants of mineral lands to the State of Alaska under subsections (a) and (b) of this section are made upon the express conditions that all sales, grants, deeds, or patents for any of the mineral lands so granted shall be subject to and contain a reservation to the State of all of the minerals in the lands so sold, granted, deeded, or patented, together with the right to prospect for, mine, and remove the same.

Section 8(b) of the Statehood Act required that three propositions be submitted to the qualified voters in the Territory of Alaska. In the event each of the three propositions was adopted by a majority of the electorate, then

> . . . the proposed constitution of the proposed State of Alaska, ratified by the people at the election held on April 24, 1956, shall be deemed amended accordingly.[10]

Of particular significance is proposition (3) which was set forth in section 8(b) of the Alaska Statehood Act. This proposition required, as a prerequisite to the territory's admission into the Union, that a majority of the qualified electorate consent to

> [a]ll provisions of the [statehood] Act . . . reserving rights or powers to the United States, as well as those prescribing the terms or conditions of the grants of lands or other property therein made to the State of Alaska, are consented to fully by said State and its people.

In my view it is not possible to draw a viable distinction between the procedural mechanism employed by Congress in the case of Alaska's admission and the power that Congress has exercised over usual admissions in the past. For I do not discern any difference between the power to declare a proposed constitution of a proposed state amended as a prerequisite to admission and the power to insist on particular constitutional provisions as a prerequisite to

several States through which the old Confederacy obtained the control of the Northwest Territory, it was provided that from this vast area new States should, from time to time, be organized, which should be admitted to the Confederacy, with the same sovereign rights enjoyed by other States.

The famous Northwest Ordinance of 1787, reenacted by the Congress of the United States in 1789, after laying down the general conditions upon which statehood was to be accorded, declared that the States, so admitted, should be 'on an equal footing with the original States in all respects whatever.'

Notwithstanding, however, this requirement of equality, Congress at an early date began the practice of exacting from would-be States various promises by the terms of which they were to hold themselves bound after their admission to the Union and until Congress should release them. Thus, for example, beginning in 1802 with Ohio, the first State formed from the Northwest Territory, it was demanded by Congress that that State, when admitted, should pass an ordinance, irrevocable without the consent of Congress, not to tax for five years all public lands sold by the United States; and a requirement substantially similar was demanded of many of the States later formed. When Missouri was admitted in 1821 it was required to declare that its Constitution should never be so construed as to permit its legislature to pass a law excluding citizens of other States from the enjoyment of any of the privileges and immunities granted them by the Federal Constitution. (footnote omitted)

1 W. Willoughby, The Constitutional Law of the United States 310–11 (2d ed. 1929).

**10.** Section 8(b) of the Statehood Act further stipulated that:

> In the event any one of the [three] foregoing propositions is not adopted at said election by a majority of the legal votes cast on said submission, the provisions of this Act shall thereupon cease to be effective.

admission. In my view, it is a logical deduction from the usual admission sequence that had Congress first passed an enabling act and then the Territory of Alaska had held its constitutional convention, the proposed constitution would have contained the restriction against alienation of mineral resources. If the proposed constitution lacked such a provision, Congress would not have admitted Alaska into the Union.

Thus, I reach the conclusion that the restraint on alienation of mineral resources provided by section 6(i) of the Alaska Statehood Act became part of the Constitution of the State of Alaska by virtue of the previously mentioned language of section 8(b) of the Alaska Statehood Act and the electorate's favorable vote upon proposition (3).[11] In my view, reliance upon the provisions of article XIII, section 1 and article XIII, section 4 as providing the exclusive procedural mechanisms for amendment of Alaska's Constitution is inapposite.[12] For at the time the electorate of the Territory of Alaska voted favorably on proposition (3), statehood had not been attained. Thus, the provisions of article XIII, section 1 and article XIII, section 4, in the factual context of the case at bar, remained inoperative until Alaska was admitted into the Union. Nor

do I view the conclusion reached here as contrary to the majority's assertion that ". . . the United States Congress has no power to amend a state's constitution." For in the instant case it was within Congress' powers over admission to insist that as a condition or prerequisite to achieving statehood the people of Alaska consent to the restriction on the power of the state to alienate its mineral resources, and that these restraints be deemed additions to the proposed constitution of Alaska. Such requirements on Congress' part are constitutionally permissible, for as the Supreme Court said in *Coyle v. Smith*

> [a] Constitution thus supervised by Congress would, after all, be a Constitution of a state, and as such subject to alteration and amendment by the state after admission.[13]

Given the conclusion that the prohibitions against alienation of mineral interests in state lands became part of Alaska's Constitution by virtue of the provisions of section 8(b) of the Statehood Act and the people's adoption of proposition (3), the question remains how such restrictions can be lifted. In *State ex rel. Interstate Stream Commission v. Reynolds,* 71 N.M. 389, 378 P.2d 622 (1963), the New Mexico Supreme Court was

---

**11.** I find further support for this conclusion in the *provisions of article VIII, section 9 which* provide in part, with respect to Alaska's natural resources that:

> Subject to the provisions of this section, the legislature may provide for the sale or grant of state lands, or interests therein, and establish sales procedures. *All sales or grants shall contain such reservations to the State of all resources as may be required by Congress or the State and shall provide for access to these resources.* (emphasis added)

Also of significance is the text of article XII, section 13 which states that:

> All provisions of the act admitting Alaska to the Union which reserve rights or powers to the United States, as well as those prescribing the terms or conditions of the grants of lands or other property, are consented to fully by the State and its people.

Admittedly section 6(i) of the Statehood Act can be viewed as a response to article VIII, section 9 of Alaska's proposed constitution. Yet Congress, in its enabling legislation, sought approval by the electorate of proposition (3) both as a condition of admission to statehood

and as an amendment to the proposed constitution.

**12.** Article XIII, section 1 provides for amendment of Alaska's Constitution by a two-third vote of each house of the legislature thereafter approved by a majority vote at the next statewide election. Article XIII, section 4 makes provision for constitutional amendment by means of a constitutional convention subject to ratification by the electorate.

**13.** 221 U.S. 559, 568, 31 S.Ct. 688, 690, 55 L.Ed. 853, 858 (1911).

A brief note should also be made with respect to the majority's position that the people of the proposed State of Alaska adopted the proposed constitution as defined by *A Report to the People of Alaska from the Alaska Constitutional Convention.* It is obvious that when the people voted on the proposed constitution, they did not have the report before them; they voted only on the proposed constitution, thus leaving the interpretation of the provisions of that document to the proposed judicial branch of government.

faced with a similar problem. In 1898 Congress enacted the Ferguson Act which granted to the territory of New Mexico 500,000 acres of land "for the establishment of permanent water reservoirs for irrigating purposes." All money derived from the trust land was to be placed in a separate fund and its use restricted to the trust purpose. The Enabling Act of 1910, pursuant to which New Mexico became a state, provided in section 10:

That it is hereby declared that all lands hereby granted, including those which, having been heretofore granted to the said Territory, are hereby expressly transferred and confirmed to the said State, *shall be by the said State held in trust, to be disposed of in whole or in part only in manner as herein provided and for the several objects specified in the respective granting and confirmatory provisions,* and that the natural products and money proceeds of any of said lands shall be subject to the same trusts as the lands producing the same. (emphasis added)

Article XXI, section 9 of the New Mexico Constitution provided:

This state and its people consent to all and singular the provisions of the said Act of Congress, approved June twentieth, nineteen hundred and ten, concerning the lands by said act granted or confirmed to this state, the terms and conditions upon which said grants and confirmations were made and the means and manner of enforcing such terms and conditions, all in every respect and particular as in said act provided.

The plaintiff brought suit challenging the constitutionality of various state statutes appropriating reservoir trust funds. The New Mexico Supreme Court held that the statutes did not conflict with the Ferguson Act, and stated:

Section 10 of the Enabling Act became a part of our fundamental law to the same extent as if it had been directly incorporated into the Constitution when thus expressly consented to by the people in Article XXI, Section 9 of the Constitution.[14]

Here, not unlike the court's analysis in *Reynolds,* I have concluded that section 6(i) of the Alaska Statehood Act became part of Alaska's fundamental law. In light of this conclusion, I would hold that Chapter 19, SLA 1976, which purportedly authorized the land exchange in question, is violative of the Alaska Constitutional prohibition against alienation of mineral resources in state lands. The relevant prohibitions against alienation of mineral resources in state lands can only be removed by amendment to the Alaska Constitution. Since Chapter 19, SLA 1976, an ordinary legislative enactment, does not have the status of a constitutional amendment, it is wholly ineffective to lift the alienation restraints in question. Thus, I conclude that the superior court's holding that Chapter 19, SLA 1976 was unconstitutional should be affirmed.

I think it appropriate to briefly express my views concerning the compact theory and the majority's disposition of this argument. My point of departure from the majority's analysis concerning appellees' compact theory centers on whether the compact which was entered into between the future state and Congress could be altered by methods other than an amendment to Alaska's Constitution. For the reasons expressed previously, I again am led to the conclusion that section 6(i) of the Alaska Statehood Act became part of Alaska's fundamental law when it was incorporated into Alaska's Constitution. Once this occurred, the compact between Congress and Alaska could only be altered on Alaska's part by constitutional amendment. Thus the approval given by Alaska's legislature[15] to the Cook Inlet land exchange is constitutionally insufficient, even in light of the fact that Congress expressly affirmed the

---

14. The New Mexico Supreme Court had previously held in *Lake Arthur Drainage Dist. v. Field,* 27 N.M. 183, 199 P. 112 (1921), that section 10 of the Enabling Act was a part of the fundamental law of the state.

15. Chapter 19, SLA 1976.

removal of the restrictions imposed against alienation of mineral interests in the State of Alaska's lands.[16]

I simply cannot accept the state's argument that the words "deemed amended accordingly" as used in section 8(c) of the Alaska Statehood Act were

intended simply to acknowledge and confirm the basic rule of federal supremacy: if any provision of the Alaska Constitution conflicted *directly* and *irreconcilably* with a provision of the Statehood Act, the former must give way.[17] (emphasis in original).

Here the interests at stake reach beyond federal supremacy or federal control and preservation of mineral interests; for the compact protected the people of Alaska from alienation of their mineral resources without their approval as given by constitutional amendment. Thus, for these additional reasons I would affirm the superior court's holding that Alaska's legislature was not empowered to waive the alienation restraints in question without the express consent of the people of Alaska.

BURKE, Justice, (dissenting in part):

I respectfully dissent on the issue of standing. In my view the record fails to show the kind of individualized harm or direct interest necessary to give plaintiffs standing to maintain their action.

Otherwise, I concur.

16. I believe that the majority's reliance on *Boeing Aircraft Co. v. Reconstruction Finance Corp.*, 25 Wash.2d 652, 171 P.2d 838 (1946) is inappropriate. The holding that "the people would speak through the mouth of the legislature in agreeing that Federal property might be taxed," 171 P.2d at 843, was merely an alternative holding which the court characterized as less compelling than its holding that the exemption from taxation was merely declaratory of the law without regard to the provisions of the compact and hence did not bind the state to exempt the federal property when the federal government allowed taxation. It has been noted that events contemporaneous with the *Boeing* decision made the constitutional issue in the case seem less important. *See Tonasket v. State,* 84 Wash.2d 164, 525 P.2d 744, 759 (1974) (Utter J., dissenting).

However, even if *Boeing* is accepted as having a valid basis, there are reasons to not ex-

tend its rationale to this case. *Boeing* involved a restriction which ran solely to the benefit of the federal government; the people of Washington were benefited by the lifting of the exemption. In the case at bar, the restriction runs in favor of the people of Alaska and represents a limitation on the actions of the state government. In such a circumstance, it would indeed be anomalous to allow the state government to consent to a modification of the compact on behalf of the people.

17. Similarly, I disagree with the state's analysis that the

dominant intention in adding this limiting provision subsection 6(i), was merely to retain discretionary federal control over the State's management of mineral in lands known at Statehood time to be chiefly valuable for commercial mineral production.